*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0272p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee/Cross-Appellant,*

            *v.*

JASON GREGORY FOWLER,
    *Defendant-Appellant/Cross-Appellee.*

> Nos. 04-4472/4473

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-00739—David A. Katz, District Judge.

Argued: April 24, 2008

Decided and Filed: August 1, 2008

Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** James A. Earhart, Louisville, Kentucky, for Appellant. Joseph R. Wilson, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** James A. Earhart, Louisville, Kentucky, for Appellant. Joseph R. Wilson, Ava M. Rotell Dustin, ASSISTANT UNITED STATES ATTORNEYS, Toledo, Ohio, for Appellee.

———————

**OPINION**

———————

ROGERS, Circuit Judge. This case is part of a consolidated appeal involving thirteen defendants who were members of the Outlaw Motorcycle Club ("OMC"), an international motorcycle club with chapters across the country and around the world. In 1997, the Federal Bureau of Investigation and state law enforcement agencies began an investigation into the Green region of the OMC, which consists of chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma. As a result of the investigation, a grand jury in the Northern District of Ohio returned a 40-count indictment in 2003 charging the defendants with various offenses, including Racketeer Influenced and Corrupt Organizations Act ("RICO"), drug trafficking, and firearms offenses. The defendants were tried before an anonymous jury.

Defendant Jason Gregory Fowler, a member of the Louisville Chapter of the OMC, was convicted on four counts: (1) a substantive RICO offense, in violation of 18 U.S.C. §§ 1962(c), 1963(a); (2) RICO conspiracy, in violation of 18 U.S.C. § 1962(d); (3) conspiracy to distribute a

controlled substance, in violation of 21 U.S.C. § 846; and (4) conspiracy to use or carry a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. § 924(o). The district court thereafter sentenced Fowler to a total of 396 months in prison.

On appeal, Fowler argues that: (1) the evidence obtained from the search of his home was acquired in violation of his Fourth Amendment rights and therefore should have been suppressed; (2) the district court erred by admitting statements that had been elicited in violation of his Fifth and Sixth Amendment rights; (3) he was entitled to a directed verdict on the RICO and RICO conspiracy charges; (4) the district court made reversible evidentiary errors with respect to Rule 404(b) evidence; (5) the district court erroneously failed to instruct the jury as to lesser-included offenses; (6) the district court erroneously calculated the Guidelines range; and (7) the district court erroneously imposed a consecutive sentence of 10 years under 18 U.S.C. § 924(c). The Government argues in its cross-appeal that Fowler's sentence should be vacated and remanded because the district court misapplied the Sentencing Guidelines by departing from the recommended life sentence without adequate justification on the record.

Fowler's arguments with respect to his convictions have no merit, but he correctly argues that the district court erroneously sentenced him to a consecutive 10-year sentence under § 924(c). Because of the influence that this error had on Fowler's overall sentence, his sentence must be vacated in its entirety. Therefore, his convictions are affirmed, and his sentence is vacated.

## I.

On November 5, 2002, a magistrate judge in the Western District of Kentucky, relying on information provided by a confidential informant, issued a search warrant for Fowler's person and his residence at 9805 Lower River Road, Louisville, Kentucky. Special Agent Richard McMahan of the Bureau of Alcohol, Tobacco and Firearms ("ATF") was in charge of executing the warrant. Out of concern for the safety of the officers involved, Agent McMahan decided that it would be best to execute the warrant after Fowler had left the residence. Under Agent McMahan's plan, the authorities were to wait for Fowler and his wife to exit the house and leave the premises in an automobile before executing the warrant. When the Fowlers did so in the middle-to-late afternoon of November 7, 2002, police officers initiated a traffic stop on the Fowlers' vehicle. After the vehicle was stopped, defendant Jason Fowler was taken out of the car, and the officers removed a weapon from him. He was then advised that the officers had a search warrant for his residence, and he was asked if he would like to be present during the execution of the search warrant. When Fowler said that he would like to be present, Agent McMahan informed him that the police officers would transport him back to the house in a squad car. Agent McMahan also told Fowler that he would need to be handcuffed, and Fowler agreed to be transported back to the house in that manner.

Upon returning to the house, Fowler remained in the squad car while the officers conducted their search, which turned up various firearms and a small quantity of methamphetamine. At some point during the search, Fowler was brought into the house so that he could be interviewed by Agent McMahan and his partner. Agent McMahan testified that he informed Fowler of his rights using the standard ATF rights advisement form. Agent McMahan further testified that during the discussion of Fowler's rights, Fowler said, "I don't know if I need an attorney," and "I don't know, do I need an attorney?" Agent McMahan informed Fowler that he would have to make that decision on his own, and Fowler thereafter signed a standard ATF waiver-of-rights form. After waiving his rights, Fowler spoke with the agents about narcotics and firearms. While they were talking, Fowler received a phone call from someone who wanted to schedule a delivery of methamphetamine to him. In cooperation with the authorities, Fowler arranged for the drugs to be delivered to his house later that day. Two individuals eventually arrived to deliver 1,484 grams of methamphetamine, and they were promptly arrested.

At approximately 10:30 or 11:00 that evening, after the officers had finished their search and arrested the methamphetamine couriers, Fowler was transported to a Jefferson County (Kentucky) Police Department station so that he could be further interviewed. During the questioning, Fowler asked about receiving consideration in exchange for his cooperation. In response, the officers called in two Assistant United States Attorneys ("AUSAs") to talk to Fowler. Although the AUSAs told Fowler that his cooperation would be taken into account on his forthcoming narcotics and firearms charges, they did not make any promises or guarantees of leniency.

Agent McMahan continued interviewing Fowler after the AUSAs left. While they were talking, Fowler spontaneously brought up an unsolved murder in Indiana and indicated that he had participated in the crime. Fowler stated that Michael Brown, a more senior OMC member, had asked Fowler to go with him to the home of an individual named Charles Hurst in order to collect a drug debt. When they arrived at the home, Brown held Hurst at gunpoint and instructed Fowler to restrain Hurst in a chair. After Brown ransacked Hurst's home, Fowler was instructed to release Hurst, whereupon Hurst was shot and killed by Brown. After killing Hurst, Brown and Fowler stole some of Hurst's personal property and departed. Upon hearing this confession, Agent McMahan immediately transported Fowler to Indiana, where the two of them met with detectives at the state police post in Sellersburg. Fowler told his story to the Indiana police and assisted them in building a case against Michael Brown. Fowler eventually testified on behalf of the prosecution in Brown's murder trial in Indiana state court. For his part in the killing, Fowler pled guilty to aiding in voluntary manslaughter.

On April 8, 2003, Fowler was named in a 40-count indictment issued in the Northern District of Ohio. As the culmination of a wide-ranging, six-year investigation of the OMC Green region, the indictment charged Fowler and 37 other OMC members with various federal crimes. Many of the allegations against Fowler stemmed from the search and corresponding questioning of Fowler that took place on November 5, 2002. The indictment charged Fowler with four offenses: (1) RICO, in violation of 18 U.S.C. § 1962(c); (2) RICO conspiracy, in violation of 18 U.S.C. § 1962(d); (3) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846; and (4) conspiracy to use or carry a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. § 924(o). The indictment alleged four predicate acts in support of the substantive RICO charge: (1) conspiring to distribute drugs, (2) the murder of Charles Hurst, (3) the robbery of Hurst, and (4) the collection of a debt from Hurst by extortionate means.

Even though he testified against Michael Brown in the Indiana murder case, Fowler refused to testify against his co-defendants in the instant case. As a result, he was unable to reach a plea agreement with the Government. In the absence of a plea agreement, he proceeded to trial and was convicted on all four counts. In a special verdict, the jury also found that Fowler had committed all four RICO predicate acts alleged against him.

At the sentencing hearing, the district court sentenced Fowler to concurrent sentences of 240 months on the RICO and RICO conspiracy offenses. With respect to the drug conspiracy offense, the district court imposed a concurrent sentence of 276 months. Finally, the district court imposed an additional 10-year consecutive sentence because the court was under the impression that such a sentence was required for Fowler's firearms-conspiracy offense. Altogether, Fowler was sentenced to a total of 396 months in prison.

**II.**

There is no merit to Fowler's claim that the district court should have suppressed the evidence obtained from the search of his home.[1] He argues that the search was conducted pursuant to an invalid search warrant because the warrant was issued on the basis of an affidavit that provided insufficient information for a finding of probable cause, but this is not so. The magistrate's finding of probable cause is entitled to great deference, and it can only be overturned if the magistrate exercised his authority arbitrarily. *See United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000); *United States v. Swihart*, 554 F.2d 264, 267-68 (6th Cir. 1977)). Because the affidavit provided sufficient information to support a finding of probable cause, it cannot be said that the magistrate exercised his authority arbitrarily.

In determining whether to issue a search warrant on the basis of a particular affidavit, a magistrate must review the affidavit according to the totality of the circumstances and "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information,' there is probable cause." *United States v. Smith*, 510 F.3d 641, 652 (6th Cir. 2007) (quoting *United States v. King*, 227 F.3d 732, 740 (6th Cir. 2000)). The affidavit underlying a search warrant is sufficient to support a finding of probable cause if, based on the totality of the circumstances, it provided the magistrate with a substantial basis for concluding that there was probable cause to issue the warrant. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). This standard is met in this case, where the affidavit stated that a confidential informant had informed Agent McMahan that Fowler was selling and using methamphetamine, that the confidential informant had seen a bag of methamphetamine in Fowler's automobile, and that the confidential informant had seen firearms inside Fowler's house. No difficulty is presented by the fact that this information came from a confidential informant because there was sufficient information in the affidavit to reasonably assure the magistrate "that the informant was credible and the information reliable." *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000) (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). For instance, Agent McMahan stated in the affidavit that he had worked with the confidential informant throughout 2002. One can logically infer from that statement that the confidential informant was credible and reliable. Otherwise, Agent McMahan would not have continued working with the confidential informant. Additionally, Agent McMahan stated that information provided by the confidential informant had already led to two investigations. If that information had not been credible, then it would not have led to investigations. Further, the affidavit stated that Agent McMahan had independently verified much of the information provided by the confidential informant, such as the location of Fowler's residence, the name of Fowler's wife, Fowler's affiliation with the OMC, Fowler's ownership of firearms, and the type of car that Fowler was driving at the time. In short, the affidavit provided the magistrate with a substantial basis for finding probable cause to issue the warrant by relating specific details about Fowler's criminal activities and possession of contraband, explaining the basis for this information, and providing implicit assurances of the reliability of the information.

Fowler, however, argues that the warrant was not supported by probable cause because it was issued on the basis of information provided by a confidential informant of unknown reliability. This clearly was not the case. Although the affidavit does not explicitly vouch for the confidential informant's credibility, that fact alone does not undermine the magistrate's finding of probable cause since there are sufficient implicit indicia of reliability. As this court said in *United States v. Allen*,

---

[1] Fowler also argues that all evidence obtained directly or indirectly from the traffic stop should have been suppressed because the defective warrant rendered the traffic stop unconstitutional. He does not dispute that the warrant authorized searches of the "*Person* and Residence of Jason Fowler." Instead, he argues that the stop was unconstitutional because the warrant was invalid. As explained in the text, however, the warrant was valid. Therefore, we need not address whether the stop would have been valid in the absence of a valid warrant to search the person of Jason Fowler.

211 F.3d 970, 975 (6th Cir. 2000), "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." Because the information in the affidavit provides a substantial basis for finding that contraband or evidence of a crime would be found at Fowler's residence or on his person, the magistrate was justified in making a finding of probable cause and issuing the warrant. Therefore, Fowler's Fourth Amendment rights were not violated, and there was no need for the district court to suppress any of the evidence obtained from the search.

Fowler also attacks the veracity of the affidavit, but this argument fails as well. He contends that the ATF agents intentionally misled the magistrate by omitting from the affidavit any acknowledgment of the fact that the confidential informant was involved in ongoing criminal activity. In the district court, Fowler unsuccessfully sought a *Franks* hearing in order to further this argument. This type of hearing emerged from the Supreme Court's recognition in *Franks v. Delaware*, 438 U.S. 154 (1978), of a defendant's right to challenge the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant. *See United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir. 1997). To facilitate such a challenge, *Franks* granted defendants a limited right to an evidentiary hearing concerning the veracity of the affidavit. In the case of alleged material omissions — by analogy to the standard for *included* false statements — the defendant is entitled to a hearing if and only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it. *See id.* at 1216-17.[2]

This court has repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement. *See, e.g., United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quoting *Atkin*, 107 F.3d at 1217); *United States v. Sawyers*, 127 F. App'x 174, 183 (6th Cir. 2005). Allegations of material omission are held to a higher standard because of the "potential for endless rounds of *Franks* hearings" due to potentially "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). This high standard was not met here.

According to Fowler, the ATF agents intentionally misled the magistrate by failing to acknowledge the confidential informant's involvement in ongoing criminal activity. This information, Fowler argues, would have made the magistrate doubt the confidential informant's veracity. This argument neglects to mention, however, that the affidavit acknowledged the confidential informant's criminal activity by stating that the confidential informant had sold methamphetamine to Fowler.

Even if the ATF agents had failed to inform the magistrate of the confidential informant's criminal activity, such an omission would not satisfy the second requirement for a *Franks* hearing because the additional information would have had no impact on the finding of probable cause. The fact that the confidential informant was engaged in criminal activities might make the confidential informant less credible than a member of the general population, but that is hardly a reason to doubt the reliability of the information given to the affiant, especially given the numerous indications of reliability provided in the affidavit. Considering that "it is often people involved in criminal

---

[2]The standard of review with respect to the denial of a *Franks* hearing is unsettled. *See United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). Some circuits employ a clear error standard, while others review the denial de novo. *See id.* In *Stewart*, this court held that "the more exacting [*de novo*] standard of review is satisfied . . . and it is unnecessary for us to further discuss the issue." *Id.* (quoting *United States v. Fields*, No. 98-5798, 2000 WL 1140557, at *3 (6th Cir. Aug. 4, 2000)). Because the same is true of this case, there is no need to decide the issue here either.

activities themselves that have the most knowledge about other criminal activities," *Martin*, 920 F.2d at 398-99, it is no surprise that most confidential informants are engaged in some sort of criminal activity. It would unduly hamper law enforcement if information from such persons were considered to be incredible simply because of their criminal status. Without more than a mere allegation that the affiant failed to disclose the nature and degree of the confidential informant's criminal activity, Fowler was not entitled to a *Franks* hearing. Therefore, the district court correctly rejected Fowler's request for a *Franks* hearing as well as his challenge to the veracity of the affidavit.

## III.

The district court did not err in admitting Fowler's post-arrest statements to the authorities because, contrary to Fowler's arguments, those statements were not obtained in violation of his Fifth or Sixth Amendment rights. First, there was no Sixth Amendment violation here because the Sixth Amendment right to counsel attaches only "at or after the initiation of adversary judicial proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). As no adversarial judicial proceedings had been initiated against Fowler at the time he was questioned, there could not have been a Sixth Amendment violation.

There was no Fifth Amendment violation here either because, considering the totality of the circumstances, Fowler's statements were not coerced or involuntary. An incriminating statement is deemed to have been coerced "when the conduct of the law enforcement officials is such as to overbear the accused's will to resist." *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). In considering whether a defendant's will has been overborne in a particular case, relevant factors "include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id.* (quoting *Ledbetter*, 35 F.3d at 1067). These factors weigh heavily against Fowler in this case. Fowler was a relatively intelligent adult who had graduated from high school, taken some community college classes, and run his own trucking company. In addition, he was read his *Miranda* rights, he indicated that he understood them, and he voluntarily signed a waiver-of-rights form. Furthermore, the length of time for which he was questioned does not appear to have had a coercive effect, he was not subjected to any physical abuse, and he was provided with a meal during the questioning. Because these facts indicate that Fowler's will to resist speaking was not overborne by police coercion, it cannot be said that his statements were obtained in violation of the Fifth Amendment.

Fowler claims that his statements were involuntary because they were induced by false promises of leniency from the Government, but he has nothing other than his own assertions to prove the existence of such false promises. That presents a problem for him because, in reviewing the denial of his motion to suppress, this court must view the evidence in the light most favorable to the Government. *See United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir. 1992) (quoting *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir. 1988)). All of the Government's evidence demonstrates that no false promises were made to Fowler. Agent McMahan, who was present during all three phases of Fowler's questioning — i.e., at Fowler's home, at the Jefferson County Police Department, and at the Indiana State Police post in Sellersburg — testified that no one ever made any promises of leniency to Fowler. Detective Larry Carroll, who was present during the questioning at Fowler's home and at the Jefferson County Police Department, also testified that no promises of leniency were made. Detective Brent Miller likewise testified that no promises of leniency were made to Fowler during his questioning at the Indiana State Police post in Sellersburg. Based on this evidence, the district court indeed found that the authorities had not made any false promises to Fowler. Such findings can only be reversed if they are clearly erroneous. *See United*

*States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Wrice*, 954 F.2d 406, 410-11 (6th Cir. 1992)). Rather than demonstrating the findings to be clearly erroneous, however, Fowler has done nothing more than restate his assertion that he was extended false promises of leniency. Therefore, because the evidence must be viewed in the light most favorable to the Government, it cannot be said that Fowler has even come close to showing that the district court's finding was clearly erroneous.

## IV.

Fowler next argues that he was entitled to a directed verdict on the substantive RICO charge and the RICO conspiracy charge. This court reviews de novo the sufficiency of the evidence to sustain a conviction. *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990). Evidence is sufficient to sustain a conviction if "after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Evaluating the evidence according to this standard, it is clear that a rational jury could be convinced beyond a reasonable doubt of Fowler's guilt on each offense.

## A.

A substantive RICO charge requires the Government to prove: (1) the existence of an enterprise which affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. *See United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983) (citing *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981); *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980); *United States v. Elliott*, 571 F.2d 880, 897-99 (5th Cir. 1978)). There is no question that the first two elements are satisfied in this case, and Fowler's challenges to the Government's proof as to the third and fourth elements are without merit.

There was sufficient evidence of the third element because Fowler's admitted role in the murder of Charles Hurst, Fowler's theft of Hurst's property, Fowler's participation in an extortionate attempt to collect a debt from Hurst, and Fowler's participation in the OMC drug-distribution ring all indicate that Fowler had, at a minimum, participated in the conduct of the enterprise's affairs by knowingly carrying out the decisions of his superiors in the OMC criminal enterprise. *See United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994).

Fowler contends that the third element was not proven because his actions did not satisfy the test for "participation in the conduct of the enterprise's affairs" that was established in *Reves v. Ernst & Young*, 507 U.S. 170 (1993). In *Reves*, the Supreme Court held that in order to establish the defendant's participation in the conduct of the enterprise's affairs, it must be proven that the defendant participated in the operation or management of the enterprise. *See Reves*, 507 U.S. at 183. Fowler argues that the *Reves* "operation or management" test was not satisfied in this case because there was no proof that Fowler had a managerial role in the OMC. The law does not require such proof. While the *Reves* "operation or management" test does place limits on the scope of activity that is criminalized under RICO, it does not require proof of a managerial role. In fact, *Reves* explicitly states that liability under 18 U.S.C. § 1962(c) is not limited to upper-level managers of the criminal enterprise. *See Reves*, 507 U.S. at 184. Instead, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* Thus, rather than requiring proof of a managerial role, *Reves* requires the Government to prove simply that the defendant had "*some* part in directing the enterprise's affairs . . . ." *See id.* at 179. Although *Reves* does not explain what it means to have

some part in directing the enterprise's affairs, subsequent decisions from our sister circuits have persuasively explained that it can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out. *See Oreto*, 37 F.3d at 750; *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995) (following *Oreto*); *United States v. Starrett*, 55 F.3d 1525, 1548 (11th Cir. 1995) (same).

In *Oreto*, the First Circuit noted that *Reves* was a case concerning "horizontal" RICO liability — i.e., the liability of advisers who are outside the organization — and did not address the "vertical" question of how far RICO liability extends down the ladder within the organization. *See Oreto*, 37 F.3d at 750. According to *Oreto*, the defendants in *Reves* were found to have no RICO liability because, as outside advisers, "they neither made [the enterprise's] decisions nor carried them out; in other words, the [defendants] were outside the chain of command through which the enterprise's affairs were conducted." *Id*. Thus, the "operation or management" test draws the line for RICO liability between those who make the enterprise's decisions or implement them, and those who do not. *Oreto* found support for this conclusion in the Supreme Court's statement that an enterprise can be operated by "lower rung participants in the enterprise who are under the *direction* of upper management." *Id*. (quoting *Reves*, 507 U.S. at 184). It also found support in the fact that "Congress declared in RICO that the statutory purpose was 'to seek the eradication of organized crime in the United States . . . .'" *See id*. at 751 (quoting Pub. L. 91-452, § 1). Based on this stated purpose, *Oreto* reasoned that "Congress intended to reach all who participate in the conduct of [the] enterprise, whether they are generals or foot soldiers." *Id*. All of this reasoning compellingly demonstrates that the *Oreto* approach is the correct one. Under this approach, the *Reves* "operation or management" test was satisfied in this case because the evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Fowler had "*some* part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179.

Likewise, there was sufficient evidence of the fourth element of substantive RICO — which requires a pattern of racketeering activity — because the evidence shows that Fowler committed at least two predicate acts that were related to the activities of the enterprise and presented the threat of continued activity. *See United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000). Fowler claims that his predicate acts do not constitute a pattern of racketeering activity because they were isolated events that had no relation to his OMC membership and posed no threat of continued activity. The evidence, however, indicates otherwise.

A pattern of racketeering activity requires a minimum of two predicate acts. *See* 18 U.S.C. § 1961(5). In order to establish that any two predicate acts constitute a pattern of racketeering activity, the Government must satisfy the "continuity plus relationship" test, which requires proof of "(1) a relationship between the predicate acts and (2) the threat of continued activity." *Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620, 622 (6th Cir. 2001) (citing *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 229 (6th Cir. 1997)).

The first prong of the "continuity plus relationship" test — the relatedness prong — was met here because the Government introduced sufficient evidence to convince a rational jury beyond a reasonable doubt that Fowler's predicate acts were related to the activities of the enterprise. *See Corrado*, 227 F.3d at 554 (quoting *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993)). The relationship of the predicate acts to the activities of the enterprise is shown most clearly by Fowler's admission that his involvement in the crimes against Charles Hurst was due to Fowler's membership in the OMC. The relationship is further supported by evidence that Hurst was killed because he owed a drug debt to an OMC member, and by evidence that the OMC regularly perpetrated violent acts in furtherance of its normal activities. Additionally, a rational jury could conclude beyond a reasonable doubt that Fowler's drug dealing was related to the OMC criminal enterprise. It is apparent that the OMC was involved in drug dealing because the record indicates that a vote was taken among its members to determine whether the OMC would ban methamphetamine sales, and

because the evidence indicates that OMC members were encouraged to sell methamphetamine in order to pay their dues. In light of this evidence, and the additional evidence that Fowler had engaged in methamphetamine transactions with at least one other OMC member, it would be difficult to conclude that Fowler's drug dealing was merely coincidental to his membership in the OMC. In short, Fowler's predicate acts were related to the activities of the enterprise. They were not, as Fowler urges, isolated and unrelated acts.

It may be true that Fowler's predicate acts are not directly interrelated with each other, but that is not required. *See Corrado*, 227 F.3d at 554. Instead, the predicate acts must "be connected to the affairs and operations of the criminal enterprise." *Id.* (citing *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993); *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985)). This can be satisfied by proof that the predicate acts were related to the activities of the enterprise, *id.* (quoting *Locascio*, 6 F.3d at 943), as is the case here.

The second prong of the "continuity plus relationship" test — the continuity prong — "is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242-43 (1989). In this case, the continuity prong is not at issue because there is little doubt that the OMC was a long-term association that existed for criminal purposes, and there is equally little doubt that Fowler was operating as a part of it.

**B.**

Fowler was not entitled to a directed verdict on the RICO conspiracy charge either. His willful participation in the robbery and murder of Charles Hurst alone satisfies the requirements for a RICO conspiracy conviction because it shows that he "intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense . . . .'" *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Additional evidence of Fowler's guilt can be found in the fact that he engaged in drug transactions with at least one other OMC member. Moreover, the Government presented evidence that Fowler had murdered an individual named Steven Gabbard because he possessed photographs that would have incriminated OMC members. From evidence that he killed someone who could have exposed the OMC's criminal activities, it can be inferred that Fowler acted with the intent of perpetuating the OMC as a criminal enterprise and thereby furthering all of its racketeering activities.

Fowler, however, challenges his conviction based on the erroneous assertion that the elements of a RICO conspiracy offense are the same as for a substantive RICO offense. From this standpoint, and with no further analysis, Fowler simply states that he was necessarily entitled to a directed verdict on the RICO conspiracy charge because the Government did not introduce sufficient evidence to convict him of a substantive RICO offense. This argument misstates the law because the elements of the two offenses are plainly different. Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts. *See id.* (citing *Salinas*, 522 U.S. at 63). Indeed, a RICO conspiracy charge does not even require proof that the defendant "agreed to commit two predicate acts himself, or even that any overt acts have been committed." *Id.* (citing *Salinas*, 522 U.S. at 63). To the contrary, it merely requires proof that the defendant "intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (quoting *Salinas*, 522 U.S. at 65). Because the Government established such proof, Fowler was not entitled to a directed verdict on the RICO conspiracy charge.

**V.**

There is also no merit to Fowler's argument that the district court should have given a lesser-included-offense instruction. As one of four RICO predicate acts alleged against Fowler, the indictment says that he committed murder under the law of Indiana because of his role in the killing of Charles Hurst. Fowler claims that the district court should have instructed the jury on the lesser-included offenses of murder under Indiana law — i.e., voluntary manslaughter, involuntary manslaughter, and criminal confinement. This, he argues, would have allowed the jury to conclude that his involvement in Hurst's killing only rose to the level of one of those lesser offenses rather than murder. First, this argument is difficult to comprehend because it cannot possibly benefit Fowler. Even if the murder predicate act were set aside, the minimum number of two predicate acts would still be present in this case because the jury found that he had conspired to distribute drugs, participated in the robbery of Hurst, and participated in the extortionate collection of a debt from Hurst. Putting this point aside, though, the problem with Fowler's argument is that a defendant is not entitled to a lesser-included-offense instruction for an offense with which he has not been charged. In other words, since Fowler was not actually charged with the offense of murder, he was not entitled to have the jury instructed on the lesser-included offenses of murder. Murder was alleged as one of Fowler's RICO predicate acts, but there is no such thing as a lesser-included-predicate-act instruction. If the jury had not been convinced that Fowler had committed the murder, they could have found so on the special verdict form. There was no reason to provide them with additional options.

**VI.**

The four evidentiary arguments that Fowler makes in favor of reversing his convictions are likewise without merit. First, the district court's error in not giving a limiting instruction with respect to evidence introduced against co-defendant David Mays was harmless. As one of the RICO predicate acts alleged against Mays, the indictment stated that he had murdered his former girlfriend, Shannon Turner. Therefore, the Government introduced evidence against Mays concerning Turner's disappearance. The Government also introduced evidence that Mays had killed an unidentified individual, had received three pounds of marijuana from Daryl Lakes, and had offered to kill people for Daryl Lakes. Because this evidence was not admissible as to Fowler, the district court should have granted Fowler's request for a limiting instruction. *See* Fed. R. Evid. 105. Nevertheless, the evidence against Fowler was so compelling that this error was harmless, especially considering that the evidence did not implicate Fowler in any wrongdoing or even mention him at all.

In addition, there was no error in the district court's admission of evidence pertaining to the disappearance of an individual named Steven Gabbard. At trial, the Government introduced evidence that Fowler had murdered Gabbard because he possessed photographs that would have incriminated OMC members. Fowler contends that this evidence linking him to Gabbard's murder was admitted under Fed. R. Evid. 404(b), and that he was therefore entitled to a limiting instruction. The evidence, however, was not admitted under Rule 404(b). Instead, it was admitted as evidence of Fowler's guilt on the RICO conspiracy charge. The evidence was properly admitted as evidence of his guilt because it tended to show Fowler's membership in the conspiracy by demonstrating that he was attempting to preserve the criminal enterprise by protecting it from discovery. In other words, the evidence was admissible because it showed that Fowler acted with the intent of "furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65.

Furthermore, several documents challenged by Fowler were properly admitted into evidence by the district court. These documents, which pertain to previous Government investigations and prosecutions of other OMC members and a private investigation of a Government agent, were found in the possession of OMC members. Without any further analysis, Fowler asserts that these documents should not have been admitted because they were irrelevant and fraught with hearsay.

However, there was no hearsay problem with the admission of these documents because they were not offered to prove the truth of the matters asserted within them. *See* Fed. R. Evid. 801(c). Instead, they were introduced to show that the individuals possessing the documents were associated with the OMC and were attempting to gather information about law enforcement activities and the identity of Government informants. This is relevant evidence, and the district court did not err by admitting it.

Additionally, Fowler protests the admission of what he calls "bulk exhibits" that were admitted at trial. Without identifying any particular piece of evidence — or even a single bulk exhibit — Fowler makes a generic argument that the evidence contained in these exhibits was irrelevant and therefore inadmissible. Because he has failed to identify specifically any evidence that he believes to have been improperly admitted, this argument will not be addressed.

## VII.

Lastly, however, Fowler's sentence must be vacated in its entirety because the district court erroneously imposed a 10-year consecutive sentence for the violation of 18 U.S.C. § 924(o). Fowler was indicted on, and convicted of, a charge of *conspiring* to violate § 924(c), which constitutes a violation of § 924(o). Nevertheless, the district court sentenced Fowler to a 10-year consecutive sentence based on the presentence report's application of the mandatory minimum provided for in 18 U.S.C. § 924(c)(1)(A)(iii), and the mandatory consecutive sentence provision found in § 924(c)(1)(D)(ii). Unlike § 924(c), however, § 924(o) by its terms does not require a consecutive sentence and, similarly, § 924(c)'s mandatory minimums do not textually apply to violations of § 924(o). *See United States v. Stubbs*, 279 F.3d 402, 409 (6th Cir. 2002) ("[T]hese two statutory provisions call for significantly different statutory penalties . . . ."), *abrogated on other grounds as recognized in United States v. Helton*, 349 F.3d 295, 299 (6th Cir. 2003); *see also id.* at 413 (dissenting op.) (minimum and consecutive requirements of § 924(c) "not mandated by the terms of [§ 924(o)]");[3] *Jackson v. United States*, No. Civ. 1:01-CV-112, Crim. 1:99CR74, Crim. 1:99CR107, 2001 WL 34563133, at *2 (W.D.N.C. June 20, 2001) ("Petitioner was convicted of conspiring to use and carry a firearm during bank robbery, in violation of 18 U.S.C. § 924(o), not § 924(c), and no mandatory minimum consecutive sentence is called for by that statute."). Section 924(o), instead of incorporating for the conspiracy the penalties for the primary offense, provides that "[a] person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years . . . and if the firearm is a machine gun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life." This is in contrast to statutory provisions like 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the *same penalties* as those prescribed for the offense . . . .") (emphasis added). It was plainly erroneous to sentence Fowler according to the mandates of § 924(c) when he was convicted of violating § 924(o) and not § 924(c). The error affected substantial rights because it subjected Fowler to a consecutive and mandatory sentence that is not mandated by the statute. Further, the error seriously affected the fairness, integrity, and public reputation of the judicial proceeding. Consequently, Fowler's sentence for the firearms conspiracy must be vacated and remanded for resentencing.

In light of the need to vacate Fowler's 10-year consecutive sentence on the firearms conspiracy offense, it is appropriate to vacate the sentences imposed for his RICO, RICO conspiracy, and narcotics conspiracy offenses as well. The district court's sentencing decisions with

---

[3]The issue that divided our court in *Stubbs* was whether § 924(c)'s mandatory and consecutive provisions applied indirectly to a violation of § 924(o) through a cross-referencing provision in U.S.S.G. § 2K2.1. *Stubbs*, 279 F.3d at 407-10, 413-19. In this case, however, there is no indication in the record or in the presentence report that the district court arrived at the mandatory and consecutive sentence it imposed using the sentencing guidelines. We therefore decline to express a view with respect to the approach discussed in *Stubbs*.

respect to these three offenses were most likely influenced by its erroneous belief that a 10-year consecutive sentence was mandated by the § 924(o) firearms-conspiracy conviction. Had the district court known that a 10-year consecutive sentence was not required, it may very well have imposed different sentences for the other convictions. Therefore, the district court should have the opportunity to resentence Fowler on all convictions with the knowledge that a 10-year consecutive sentence is not required for the firearms-conspiracy conviction. Accordingly, Fowler's entire sentence is vacated, and the case is remanded for resentencing.

## VIII.

For the foregoing reasons, Fowler's convictions are AFFIRMED, his sentence is VACATED, and the case is REMANDED for resentencing.