*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0366a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

>    *Plaintiff-Appellee,*

*v.*    No. 04-4480

ALLEN CHESTER LAWSON,

>    *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-00739—David A. Katz, District Judge.

Argued:  April 24, 2008

Decided and Filed:  October 9, 2008

Before:  DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  David E. Koerner, LAW OFFICE, Perry, Ohio, for Appellant.  Joseph R. Wilson, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.  **ON BRIEF:**  David E. Koerner, LAW OFFICE, Perry, Ohio, for Appellant.  Joseph R. Wilson, Ava M. Rotell Dustin, ASSISTANT UNITED STATES ATTORNEYS, Toledo, Ohio, for Appellee.

———————————

## AMENDED OPINION

———————————

ROGERS, Circuit Judge.  This case is part of a consolidated appeal involving thirteen defendants who were members of the Outlaw Motorcycle Club ("OMC"), an international motorcycle club with chapters across the country and around the world.  In 1997, the Federal Bureau of Investigation and state law enforcement agencies began an investigation into the Green region of the OMC, which consists of chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma.  As a result of the investigation, a grand jury in the Northern District of Ohio returned a 40-count indictment in 2003 charging the defendants with various offenses, including Racketeer Influenced and Corrupt Organizations Act ("RICO"), drug trafficking, and firearms offenses.  The defendants were tried before an anonymous jury.

Defendant Allen C. Lawson, a member of the OMC chapter in Dayton, Ohio, was charged with four offenses: (1) substantive RICO in violation of 18 U.S.C. § 1962(c); (2) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (3) conspiracy to distribute controlled substances in violation

of 21 U.S.C. § 846; and (4) distribution and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). In support of the RICO charge, the indictment alleged four RICO predicate acts against Lawson: (1) conspiracy to distribute controlled substances; (2) distribution of marijuana; (3) distribution of valium; and (4) the 2001 murder of Eric Coulter at a Dayton, Ohio, strip club named Spanky's Dollhouse.

To prove the charges against Lawson, the Government introduced evidence showing that Lawson was a large-scale drug dealer. Former OMC members testified that Lawson had supplied them with large quantities of drugs. Richard Gilligan testified that while he was an OMC member, he purchased as much as 10 pounds of marijuana from Lawson at one time and then resold the marijuana to other individuals in smaller quantities. Further, Gary Watkins testified that while he was an OMC member, Lawson supplied him with 20,000 valium pills so that he could make money from reselling those drugs to others. A witness named James Dilts also testified that Lawson claimed to have had three people selling valium for him and claimed to be making $1,200 per week from their efforts.

The Government also introduced extensive evidence pertaining to the murder of Eric Coulter in order to establish the murder as one of Lawson's RICO predicate acts. Coulter was murdered during a brawl in 2001 at a Dayton, Ohio, strip club named Spanky's Dollhouse. Through eyewitness testimony and videotape from security cameras, the Government sought to prove that Lawson was guilty of murder under Ohio law. The evidence showed that in February of 2001 a fight broke out at Spanky's Dollhouse between OMC members and other patrons. Lawson's role in the fight is disputed. The Government contends that Lawson assaulted Eric Coulter with wooden clubs and a beer bottle. Lawson says that he merely threw things at Coulter and swung a beer bottle at him. What is undisputed is that OMC member Glen Carlisle approached Coulter during the fracas and shot him in the buttocks. Shortly thereafter, a member of a different motorcycle gang delivered a fatal gunshot wound to Coulter's chest. Lawson admits that he was present during the incident and assaulted Coulter, but he denies that he had anything to do with the murder.

The jury found Lawson guilty of all four offenses with which he was charged. In a special verdict, the jury also concluded that Lawson had committed each of the four RICO predicate acts alleged in the indictment. Following this verdict, the district court sentenced Lawson to 235 months in prison.

On appeal, Lawson argues that his convictions and sentence should be reversed for the following reasons: (1) because his right to an impartial jury was violated by the district court's empaneling of an anonymous jury, as well as the district court's reading of the indictment to the prospective jurors and the pre-trial publicity furthered by the Government; (2) because the district court committed reversible error by admitting evidence that his nickname is "Psycho" and by admitting evidence of the Coulter murder; (3) because his convictions were not supported by sufficient evidence; and (4) because the district court erroneously sentenced him under a mandatory Guidelines regime.[1] None of these claims warrant the reversal of Lawson's convictions. However,

---

[1] Lawson also adopts the following arguments of co-defendant John P. Walker: (1) that the admission of post-arrest statements made by co-defendants Fowler and Carlisle was a violation of the Confrontation Clause; (2) that the empaneling of an anonymous jury was unconstitutional; and (3) that, with respect to the narcotics conspiracy charge, the district court should have instructed the jury on the lesser-included offense of simple possession. The first argument is discussed in *United States v. Walker*, No. 04-4478, 2008 WL 2939489 (6th Cir. 2008), and the entire discussion need not be repeated here. Any violation of the Confrontation Clause was rendered harmless by the fact that the evidence against Lawson was so strong that he would have been convicted even if the statements had not been admitted. Likewise, any error caused by the district court's failure to give a limiting instruction with respect to Fowler's and Carlisle's statements was also rendered harmless by the overwhelming evidence of Lawson's guilt. The second adopted argument is combined with Lawson's own objections to the anonymous jury and is fully discussed in this opinion. Finally, the third argument is fully disposed of in *Walker* and need not be addressed here.

because we conclude that there is insufficient evidence to support the RICO predicate act that was used to determine Lawson's sentencing range under the Sentencing Guidelines, we vacate Lawson's sentence and remand the case for resentencing.

## I.

The decision to empanel an anonymous jury "is within the sound discretion of the trial court." *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999) (citing *United States v. Eufrasio*, 935 F.2d 553, 573 (3d Cir. 1991)).  In this case, the district court did not abuse its discretion.  We have referred in the past to the Second Circuit's preference that "a district court should not order the empaneling of an anonymous jury without '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" *Id.* (quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991)).  The anonymity of a jury should be preserved in situations including, but not necessarily limited to, the following: (1) when the case involves very dangerous defendants who were participants in large-scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; (2) when the defendants had a history of attempted jury tampering and serious criminal records; or (3) when there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity.  *See id.* (citing *Paccione*, 949 F.2d at 1192).  The district court found all three of these situations to be present in this case, and the defendants have not shown that factual finding to be clearly erroneous.

At least the first and third of the three situations described in *Talley* are present in this case.  The evidence portrays the defendants as very dangerous individuals who, through their membership in the OMC, were part of a large-scale criminal enterprise.  Further, the evidence shows that some of them had participated in mob-style killings — for instance, co-defendant Jason Fowler's participation in the murder of a man who owed a drug debt to an OMC member.  *See United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008).  OMC members had also attempted to interfere with criminal investigations by taking measures to identify government informants.  Moreover, there had been allegations of dangerous and unscrupulous conduct by the defendants coupled with pretrial publicity.  Though publicity may not have been particularly extensive, the media had reported on the case in two prominent newspaper articles, one of which described the trial as "one of the largest federal racketeering cases ever."  More importantly, not only had the defendants dealt drugs and committed violent crimes, but a lawyer for the Government also stated on the record that the FBI had corroborated allegations from a confidential informant that the defendants "were contracting to arrange the murders of witnesses, court officers, and prosecutors [in this case]."  Based on all of this, the district court was well within its discretion to empanel an anonymous jury.

Having appropriately determined the need for an anonymous jury, the district court took proper precautions to minimize any prejudicial effects and to ensure that the defendants' fundamental rights were not affected.  The district court protected the defendants' ability to challenge potential jurors by providing that, even though the jurors' names would remain confidential, the defendants would be informed of each prospective juror's community of residence, education, and type of work experience.  The district court allowed for a three-day voir dire process, which helped to ensure that the defendants received an unbiased and impartial jury by giving the defendants an opportunity to detect and root out prejudice from the jury pool.  Finally, the district court avoided implying that anonymity was required because the defendants were dangerous.  The court provided the jurors with a neutral, non-prejudicial reason for requiring their anonymity by telling them that anonymity was required by the unusually large number of prospective jurors and defendants and by asserting that anonymity would help ensure a fair trial.  The district court's explanation would have been better if it had premised anonymity on the need to prevent the jurors from being harassed by the media, as the district court did in *Talley*, 164 F.3d at 1002 n.7, but the

explanation offered in this case was sufficient to prevent the jurors from "inferring that anonymity was necessary due to the character of the defendant." *Id.* at 1002.

Contrary to Lawson's argument, there is no constitutional right to a public jury. The Sixth Amendment provides defendants with a right to a public *trial* by an impartial jury, but it does not guarantee a right to a public *jury*. *See* U.S. Const. amend. VI. Thus, the text of the Constitution does not warrant holding that defendants have a right to be informed of jurors' identities. The absence of any right to juror identification is further demonstrated by Founding-era evidence indicating that such a right was not intended to be part of the Constitution. *See* Kory A. Langhofer, Comment, *Unaccountable at the Founding: The Originalist Case for Anonymous Juries*, 115 Yale L.J. 1823, 1826-31 (2006). There may be instances in which an anonymous jury is empaneled in such a way as to jeopardize constitutional rights — such as the right to a presumption of innocence — but an anonymous jury is not a constitutional violation in and of itself.

Lawson's rights were also not violated by the district court's reading of the indictment to the prospective jurors. The rule is clear in this circuit that the district court "has discretion to submit the indictment to the jury in a criminal case as long as limiting instructions are given to the effect that the indictment is not to be considered as evidence of the guilt of the accused." *United States v. Scales*, 594 F.2d 558, 561-62 (6th Cir. 1979) (citing *Garner v. United States*, 244 F.2d 575 (6th Cir. 1957); *United States v. Russo*, 480 F.2d 1228, 1244 (6th Cir. 1973)). Because appropriate limiting instructions were given in this case, the district court's act of reading the indictment to the prospective jurors was not an abuse of discretion. Lawson argues that it was wrong for the indictment to be read to the jury because it allowed the jurors to be exposed to allegations of overt acts that were not proven at trial. However, the court's limiting instruction eliminated any prejudice that might have been caused.

Pre-trial publicity did not violate Lawson's right to an impartial jury either, because the publicity in this case caused neither presumptive nor actual prejudice. *See Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) (citing *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999)). "The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors," *Foley*, 488 F.3d at 387 (citing *Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002)), and the record does not indicate that voir dire uncovered any actual prejudice. Merely demonstrating that there was negative media coverage and that the jurors may have had prior knowledge of the issues involved in a case is not sufficient to prove actual prejudice. *See id.* Presumptive prejudice was not present here either since a circus-like atmosphere did not pervade the courthouse and surrounding community. *See id.* (citing *Ritchie*, 313 F.3d at 952-53; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000)). Instead, there were merely two local newspaper articles, one published in the *Toledo Blade* and one published in the *Cleveland Plain Dealer*, which gave background information about the OMC, reported on the charges brought in the indictment, and discussed the previous federal prosecution in Florida of James Wheeler, the OMC international president. Although both articles were prominent, neither was incendiary, much less did they create a circus-like atmosphere about the proceedings.

In an attempt to prove that his right to an impartial jury was trampled upon, Lawson argues that the Government violated the district court's pre-trial publicity order and did so in an attempt to inflame the passions of the jury pool. Not only does this argument fail to address actual or presumptive prejudice, but it is also flatly wrong. The district court's pre-trial order was not a gag order; it simply reminded the lawyers to abide by the professional rules regarding publicity. The Government attorneys do not appear to have violated those rules. From the evidence in the record, it appears that only the article in the *Toledo Blade* contained information from a Government attorney involved in the prosecution of this case. In that article, one of the Assistant United States Attorneys stated that the charges against James Wheeler in the instant case are not the same charges that Wheeler faced in Florida. This is simply a legitimate attempt to re-state something that appears

in public records, and does not appear to be a violation of any professional ethics rules.  More importantly, at least as far as Lawson is concerned, nothing suggests that the passions of the jury pool were inflamed by the Government's pre-trial statements, or by statements from any other source.

## II.

Lawson's evidentiary challenges also do not require reversal.  Lawson contends that the district court should not have admitted evidence concerning the murder of Eric Coulter at Spanky's Dollhouse.  This evidence, Lawson argues, was not admissible because it was irrelevant and not probative.  To the contrary, the evidence was relevant and admissible.  Rule 401 of the Federal Rules of Evidence says that "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Lawson's involvement in Coulter's murder is a fact that is of consequence to the determination of the action because the indictment alleges that Coulter's murder was one of Lawson's RICO predicate acts.  Because the evidence at issue tends to make the existence of that fact more or less probable, the evidence was relevant and admissible.  *See* Fed. R. Evid. 402.

Lawson argues that the Spanky's Dollhouse security camera videotape should have been excluded from evidence because it shows that someone other than Lawson killed Coulter.  Ironically, if that is the case, then the videotape is admissible precisely because it shows that Lawson did not commit the murder.  The rule says that evidence is relevant if it makes a fact that is of consequence more or *less* probable than it would be without the evidence.  *See* Fed. R. Evid. 401.  Although one would normally expect the Government to introduce only evidence of guilt, a piece of exculpatory evidence is not rendered irrelevant or inadmissible simply because it is offered by the Government.

Lawson also argues that evidence of Coulter's murder should have been kept out of the trial under Rule 403 of the Federal Rules of Evidence because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.  This argument lacks merit.  Within the context of Rule 403, "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis."  *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).  The evidence concerning Coulter's murder is nothing more than direct evidence of a charged offense.  It has nothing but legitimate probative force and does not suggest a decision on an improper basis.  Because it is highly probative on the question of whether Lawson committed the RICO predicate act of murder, the district court properly refused to exclude the evidence under Rule 403.

Finally, it might be the case that the jury should not have been permitted to hear that Lawson's nickname is "Psycho" since the nickname was not necessary to identify him or connect him with the acts charged.  *Cf. United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001) (dealing with the use of an alias in the indictment).  Nevertheless, any error in this regard was harmless because, given the weight of evidence against Lawson, the outcome of trial would not have been any different if the evidence had not been admitted.  *See United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007) (quoting *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006)).

## III.

Lawson was not entitled to a directed verdict on any of the charges of which he was convicted.  This court reviews de novo the sufficiency of the evidence to sustain a conviction.  *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990).  Evidence is sufficient to sustain a

conviction if "after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Evaluating the evidence according to this standard, it is clear that a rational jury could be convinced beyond a reasonable doubt of Lawson's guilt on each offense.

## A.

A substantive RICO charge requires the Government to prove: (1) the existence of an enterprise which affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. *See United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983) (citing *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981); *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980); *United States v. Elliott*, 571 F.2d 880, 897-99 (5th Cir. 1978)). Only the third and fourth elements are at issue here, and both were sufficiently proven by the Government.

The third element is established here because the evidence is sufficient to convince a rational jury beyond a reasonable doubt that Lawson participated in the operation or management of the criminal enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). The evidence indicates that one of the activities of the OMC criminal enterprise was the distribution of controlled substances. In fact, one can gather from the evidence that this was a prime source of funding for the OMC. The evidence also indicates that Lawson supplied large quantities of drugs to other OMC members with the knowledge that the members would resell the drugs at a profit. Viewed in the light most favorable to the Government, this evidence — coupled with Lawson's membership in the OMC — was enough for a rational trier of fact to infer that Lawson's drug dealing was an implementation of the OMC's decisions and policies concerning drug distribution. As explained in the companion case of *United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008), this is sufficient to satisfy the *Reves* "operation or management" test.

The evidence is also sufficient to allow a rational trier of fact to find the fourth element of the RICO offense — participation through a pattern of racketeering activity — beyond a reasonable doubt. A pattern of racketeering activity requires at least two predicate acts. *See* 18 U.S.C. § 1961(5). Four predicate acts were alleged against Lawson — Racketeering Act 1A (conspiracy to distribute controlled substances among OMC members), Racketeering Act 3 (distribution of marijuana), Racketeering Act 4 (distribution of valium), and Racketeering Act 25 (the murder of Eric Coulter). The jury found that Lawson committed all four predicate acts. Lawson, however, argues that there are too few predicate acts to support a RICO conviction because there is not sufficient evidence to prove that he committed Act 25, and because Acts 1A, 3, and 4 are really just one predicate act.

With respect to Act 25, Lawson appears to be correct; the evidence does not appear to permit a finding that he murdered Eric Coulter. It is undisputed that Glen Carlisle shot Coulter, and there is no evidence that Lawson aided Carlisle in any way, much less that he had the intent to do so. A member of a different motorcycle gang delivered the fatal shot, and there is no evidence that Lawson aided that act either. Thus, while Lawson admits that there is evidence that he assaulted Coulter, there is essentially no evidence to support a finding that he murdered Coulter. However, this makes no difference in the ultimate outcome because there is sufficient evidence to support the jury's findings on the other three predicate acts, which, contrary to Lawson's argument, are three distinct predicate acts. Lawson alleges that the drug conspiracy predicate act (1A) and the two drug distribution predicate acts must be merged into one predicate act because they were all part of the same conspiracy alleged in Racketeering Act 1A. This is not correct though. Conspiracy to commit

a substantive crime and the substantive offense itself may count as separate predicate acts for RICO purposes. We squarely so held in *United States v. Licavoli*, 725 F.2d 1040, 1044-47 (6th Cir. 1984). Therefore, even without Racketeering Act 25, there are still enough predicate acts to sustain a RICO conviction.

The Government has also met the fourth element's additional requirement of satisfying the "continuity plus relationship" test by demonstrating a relationship between the predicate acts as well as a threat of continued activity. *See Snowden v. Lexmark Int'l*, 237 F.3d 620, 622 (6th Cir. 2001) (citing *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 229 (6th Cir. 1997)). Based on the extensive evidence of the OMC's participation in the drug trade, a rational jury could easily conclude that Racketeering Acts 1A, 3, and 4 were related to the activities of the enterprise. This is sufficient to satisfy the relatedness prong of the "continuity plus relationship" test. *See United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (quoting *United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993)). The Government need not prove that the predicate acts were directly interrelated. *See id.* Instead, the predicate acts must "be connected to the affairs and operations of the criminal enterprise." *Id.* (citing *United States v. Locascio*, 6 F.3d at 943; *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985)). This can be established "by proof that: (1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise." *Id.* (quoting *Locascio*, 6 F.3d at 943).

Finally, there is no real question that the racketeering acts presented a threat of continued activity. The evidence is ample that "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243 (1989).

In short, the evidence belies that Racketeering Acts 1A, 3, and 4 were sporadic, unrelated activities. There was sufficient evidence that they constituted a pattern of racketeering activity.

**B.**

Lawson argues that his RICO conspiracy conviction must be overturned because there is no evidence that he entered into an agreement to violate RICO. Although there is no direct evidence that Lawson entered into such an agreement, his RICO conspiracy conviction must be affirmed nonetheless because the agreement can be inferred from his acts. *See United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006) (citing *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990)). The OMC was an organization that encouraged its members to engage in the drug trade. One can infer from the evidence that it facilitated such endeavors so that the profits could be used to finance the OMC's activities. Although there is no direct evidence that Lawson's drug profits went to the OMC, it was reasonable to infer that he joined the OMC drug-distribution ring and thereby agreed to violate RICO. Lawson contends that his drug dealing was not connected to the OMC and therefore is not evidence of an agreement to be part of the OMC drug-distribution ring. This argument is contradicted by evidence showing that he supplied drugs to fellow OMC members, and by the evidence that he did so with the knowledge that the drugs would be resold to the general public. Thus, one can infer that he had entered into an agreement with other OMC members to violate RICO by operating a drug ring. And because the evidence shows that Lawson committed three RICO predicate acts, a rational jury could infer that Lawson agreed that either he or someone else would commit at least two RICO predicate acts. This is sufficient for a RICO conspiracy conviction because it shows that he "intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense . . . .'" *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

**C.**

Lawson's narcotics conspiracy conviction could be supported solely by James Dilts's testimony that Lawson had told Dilts that Lawson "had three other individuals selling valium for him . . . [and] made a profit of $1,200 a month from those three." The evidence of his guilt is all the more convincing when combined with the facts that Lawson was a member of an organization that distributed drugs — i.e., the OMC — and that he supplied drugs to other members of that organization with knowledge that the drugs would be broken down into smaller quantities and resold. All of this evidence allows for a finding of guilt beyond a reasonable doubt because it permits a rational jury to conclude that Lawson (1) had entered into an agreement with two or more persons to violate the drug laws, (2) had knowledge and intent to join in the conspiracy, and (3) participated in the conspiracy. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (citing *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001); *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir. 1996)).

**D.**

Lawson understandably does not provide any analysis for his claim that there is insufficient evidence to support his conviction of distribution and possession with intent to distribute marijuana. This issue is without merit because there is ample evidence demonstrating that Lawson possessed marijuana with the intent to distribute. Multiple individuals testified that they had purchased marijuana from Lawson and that Lawson knowingly possessed marijuana that he intended to distribute. Such evidence is sufficient to support this conviction. *See United States v. Pope*, 561 F.2d 663, 670 (6th Cir. 1977) (quoting *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976)).

**IV.**

Finally, Lawson's sentence must be vacated because of our conclusion that there is no evidence to support the jury's finding that he committed Racketeering Act 25 — i.e., the murder of Eric Coulter. The Sentencing Guidelines prescribe that the base offense level for unlawful conduct related to RICO shall be the greater of either 19 or the "offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(2) (2007). When a defendant has various RICO predicate acts, as Lawson does, the "offense level applicable to the underlying racketeering activity" is determined according to the racketeering activity that carries the greatest offense level. *See id.* § 2E1.1 cmt. n.1. Among the racketeering acts that the jury found Lawson to have committed, murder carried the highest offense level. Therefore, at Lawson's original sentencing, his offense level was determined according to the offense level for murder. However, in light of our conclusion that there is insufficient evidence to support a finding that Lawson committed murder, his offense level was based on an inapplicable predicate act. As a result, Lawson's sentence must be vacated, and the case must be remanded for resentencing.

**V.**

For the foregoing reasons, Lawson's convictions are AFFIRMED, his sentence is VACATED, and the case is REMANDED for resentencing.