NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0125n.06
Filed: February 12, 2009

No. 06-4205

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| THOMAS CONDON, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| JEFFREY WOLFE, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

_____

BEFORE: MOORE, GRIFFIN, and BRIGHT,[*] Circuit Judges.

GRIFFIN, Circuit Judge.

Petitioner Thomas Condon was convicted of abusing a corpse after he gained unauthorized entry to a county morgue and photographed dead bodies that he had posed in various positions and with various props. Condon filed an application for a writ of habeas corpus, claiming that the prosecution denied him a fair trial by making inappropriate statements during its closing argument and by refusing to disclose a document that the trial court ruled was not exculpatory. He also argues that the trial court erred by refusing to issue his preferred jury instructions, that Ohio's abuse of a corpse statute is unconstitutionally vague and overbroad, and that his activities constituted protected

_____

[*]The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

expression. Because we conclude that the prosecutor's behavior did not constitute error requiring

reversal, and because petitioner's other arguments lack merit, we affirm.

I.

In January 2001, a grand jury in Hamilton County, Ohio, returned a twenty-five count

indictment against petitioner Thomas Condon, charging him with twelve counts of gross abuse of

a corpse in violation of OHIO REV. CODE § 2927.01. Following a trial in the Hamilton County Court

of Common Pleas, a jury convicted Condon of eight counts of abuse of a corpse and the trial judge

sentenced him to two and one-half years of incarceration. Condon appealed his conviction to the

Ohio Court of Appeals, which affirmed his conviction but reduced his sentence to eighteen months.

*State v. Condon*, 789 N.E.2d 696 (Ohio Ct. App. 2003). Condon appealed to the Ohio Supreme

Court, but that court chose not to accept the appeal. *State v. Condon*, 795 N.E.2d 684 (Ohio 2003)

(table).

On direct appeal, the Ohio Court of Appeals stated the facts underlying Condon's conviction

as follows:[1]

*A. Prelude*

In 1999, Ernest Waits, owner of Universal Media Consultants, and Condon, his
associate and photographer, approached Terry Daly, office administrative assistant
for the Hamilton County Coroner's office, concerning their interest in a video project
explaining death to children. Waits also informed Daly about a project that Condon

---

[1]The factual determinations made by the state court are presumed correct unless the petitioner
rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *James v. Brigano*, 470 F.3d
636, 643 (6th Cir. 2006). Petitioner does not challenge these facts; his appeal relates only to the
legal conclusions derived from them.

was separately interested in, a photographic essay called "life cycles" that sought to capture each life cycle of a human being, including death. Daly explained that he could not allow Waits to do an unofficial project but asked him if he would be interested in creating an autopsy video for educational and professional purposes.

In March 1999, Hamilton County Chief Deputy Coroner Dr. Carl Parrott held a meeting with Daly, Waits, Rhonda Lindemann, the Hamilton County Coroner's office administrator, and Condon to discuss making the proposed autopsy-training video. Dr. Robert Pfalzgraf, Chief Deputy Coroner of Pathology, may have been present at this meeting. The participants discussed that the video was to be used in a "death investigation" seminar designed to provide a detailed account of a death investigation, starting with the death and ending with a prosecution. The meeting adjourned with Parrott stating that he would contact the prosecutor's office for an opinion regarding the legal ramifications of videotaping corpses–particularly whether consent of the families was needed.

Parrott testified that they discussed one of Waits's personal projects at the meeting, but he did not recall discussing anything proposed specifically by Condon. Daly recalled that there was some initial discussion regarding whether Waits and Condon could do their projects as a "quid pro quo" if they worked on the training video. Waits testified that Condon's project was discussed at the meeting and that Condon had given Parrott material pertinent to his project. Waits recalled that he was told that, before going forward with any of the projects, the coroner's office needed to secure permission from the prosecutor's office. He also recalled being told that the coroner's office would maintain complete control over any photographic images.

The coroner's office subsequently received an opinion from the prosecutor's office regarding the propriety of using morgue corpses for an autopsy-training video. Although the letter was not admitted into evidence, Daly testified that the letter stated that use of morgue corpses for the video would be permissible only with court approval and/or the consent of the next of kin. Daly also testified that Parrott had declined the requests of Waits and Condon to pursue their individual projects.

In July 2000, Waits and Condon received permission to enter the morgue to determine what resources they would need to make the autopsy-training video. According to Parrott, Condon was granted only limited access to the morgue to view one autopsy and to take limited photographs of the autopsy for the sole purpose of assessing the cost of the autopsy-training video. Parrott testified that Condon was not given permission to take or keep photographs for his personal use.

Condon then visited the morgue on at least two occasions with official authorization in August 2000. On the first visit, both Waits and Condon merely assessed the autopsy room. On the second visit, on August 16, Condon videotaped Pfalzgraf performing an autopsy on John Brady. Pfalzgraf testified that Condon also took still pictures of the procedure.

Subsequent discussion ensued regarding the cost of the training video. Waits submitted an estimate of $10,000. Both Parrott and Lindemann testified that the coroner's office did not have the necessary funds in its budget and that consequently the project was put in abeyance.

There was a welter of testimony regarding who knew what and when with regard to the cancellation of the video project. Parrott testified that he informed Lindemann that the autopsy-training video had been cancelled and that Condon no longer had permission to be in the morgue after the project was cancelled. Pfalzgraf testified that he was never informed that the videotape project had been discontinued or that Condon was not allowed in the morgue. Daly further testified that he informed Waits in September that the autopsy-training video project could not be completed based on the budget set for 2000 and 2001. Daly testified that he had informed Condon in October that the autopsy-training video project would not go forward.

*B. Life Cycles*

After October 2000, with the autopsy-training video project cancelled or on hold, Condon no longer had official authorization to be in the morgue for any purpose, let alone taking pictures of morgue corpses. Nonetheless, evidence was presented that after October 2000, Condon continued to visit the morgue and continued to take pictures of morgue corpses, apparently for the purposes of his own pet project, "life cycles," for which, as noted, he had been officially denied permission. During this period of unauthorized entry, he took pictures of the bodies of Adam Richardson, Perry Melton, Thomas Senteney, Debbie Beckman, Barbara Sowards, and Jonathan Frith. The pictures of Frith were apparently taken during the young boy's autopsy. In some of the pictures, Condon had placed props on or near the body, while some of the pictures were simply of the body lying in a state of repose.

Finally, on January 7, 2001, Tyrone Smith and Clyde Gamble, both morgue attendants, saw Condon come into the morgue in the afternoon. According to Smith, he, Gamble, and Dr. Jonathan Tobias, a junior pathologist, were alone in the morgue when Condon came in with his camera equipment. According to Gamble, Condon talked with Tobias about the smell coming from an autopsy Tobias was performing

at the time and then entered a cooler where cadavers were stored in body bags. Gamble observed Condon bring in lighting equipment. Smith and Gamble testified that Condon spent one to one and one-half hours in the cooler. Gamble testified that Condon came out of the cooler a number of times to get paper towels. At some point, Smith entered the cooler to get a body for a funeral home, and he saw Condon standing by Christina Folchi's body with photographic lights positioned around it. Smith testified that Condon appeared to be taking pictures of Folchi, a nineteen-year-old accident victim, and that her body was completely exposed. Subsequent pictures of the body taken by Condon and obtained by the police showed Folchi's body with a catheter tube in her incision, cloth over her eyes, objects on her body (a snail shell, a "Will" card, and sheet music, some of which were positioned around her pubic area), a book by her side, and a key in her mouth.

On January 8, 2001, Brent Erke was working at Robin Imaging Photography Lab ("Robin Imaging") when he noticed some "questionable" black-and-white film being reproduced into a negative format. Erke was shocked and mortified by the negatives and notified his boss and owner, William Johnson, who examined the negatives and then called the police. Johnson confirmed that the film had been brought in by Condon. At the request of the police, Johnson made a copy of the negatives and returned the original set to Condon.

Police obtained a warrant to search Condon's studio, located in Hamilton County. Props identical to those used in some of the photographs were discovered, as well as both negatives and developed photographs depicting cadavers with props placed next to the bodies. Condon's car was also searched, and the police recovered other props used in the photographs.

The police were able to identify the bodies pictured in the negatives and photographs recovered from Condon. Records were introduced into evidence demonstrating the date and time each body was brought into the morgue and released. With the exception of the Brady corpse, none of the bodies had been in the morgue at a time Condon was authorized to be in the facility.

Cal Kowal, a professor of art at the Cincinnati Museum Art School, testified on Condon's behalf. He testified that photography was an "art form." Kowal stated that, in traditional photography, the artist worked first with a negative to create his work. He stated that, historically, art dealt with the body and that there had always been representation of corpses. According to Kowal, artists did take pictures of corpses. He stated that Andres Serrano had a show of photographs taken in a morgue and that

Joel-Peter Witkin worked with body parts.  In Kowal's opinion, Condon's project on "life cycles" was a "valid concept."

*Condon*, 789 N.E.2d at 701-03.

After the state court of appeals affirmed his conviction, Condon filed a Petition for Writ of Habeas Corpus in the United States District Court for the Southern District of Ohio.  The district court denied the writ, and Condon timely appealed.

## II.

A habeas petitioner is not entitled to the writ unless the state court's decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court has held that a violation of law is "clearly established" if it contradicts the holdings of the Supreme Court, as opposed to its dicta, at the time of the relevant state court decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Petitioner argues that the prosecutor's behavior made in the course of his closing argument during the state court trial amounts to misconduct and that this misconduct denied Condon a fair trial.

## A.

Condon classifies the prosecutor's misconduct into three categories: (1) denigrating remarks towards defense counsel, (2) reference to evidence outside of the record, and (3) improper use of sexual innuendo and emotional appeal.

1.

Petitioner argues that the prosecution denied him a fair trial when it "denigrated the role of defense counsel" during closing arguments. Condon alleges that the prosecutor denigrated the role of defense counsel by using profanity to describe Condon's assertion that his photography project was a form of art, and by inferring that defense counsel improperly influenced defense witness Ernie Waits.

Condon alleges that the following statement made by the prosecutor during closing arguments is prosecutorial misconduct requiring reversal:

> There are some things that scream out to be addressed and I'm going to start with some of [defense counsel's] comments.
>
> First of all, he has the audacity to come into this courtroom in front of you, in front of the relatives of these victims, and refer to this *bullshit project as art*, is an insult to the victims and especially the families.

*Condon*, 789 N.E.2d at 714. Petitioner's counsel objected. *Id*. The trial court "overruled" the objection but issued a curative instruction to the jury, reminding the jury that counsel's comments were not evidence. *Id*. The prosecutor then stated that "[i]t's outrageous that they would even consider calling that art work." *Id*. Condon's attorney did not object to this statement. *Id*.

Petitioner argues further that the prosecutor engaged in misconduct by suggesting to the jury that defense counsel improperly influenced the testimony of defense witness Ernie Waits. During the prosecutor's closing argument, he attempted to show that Waits's testimony was inconsistent:

> Now, this is back when Ernie Waits had this fresh in his mind, before he had a little meeting with all of the defense attorneys on the defense team, before he had a chance to have his memory altered in some fashion . . . .

*Condon*, 789 N.E.2d at 715. Condon's attorney did not make an objection. *Id*.

Before we can consider whether these statements constituted prosecutorial misconduct, we must resolve respondent's invocation of the procedural default bar. Wolfe argues that Condon failed to comply with a state procedural rule by not objecting to the prosecutor's statements involving Ernie Waits. The procedural default bar, as applied in the habeas context, "precludes federal courts from reviewing claims that a state court has declined to address, because of a petitioner's noncompliance with a state procedural requirement." *Howard v. Bouchard*, 405 F.3d 459, 475 (6th Cir. 2005). *See also Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

At the time of petitioner's trial, Ohio's contemporary objection rule was well established. *See, e.g., State v. Brown*, 528 N.E.2d 523, 534 (Ohio 1988) ("Error that is not specifically objected to at trial is waived.") (citation omitted). We have previously held that "Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice." *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Respondent argues that by not objecting to the prosecutor's remarks regarding Waits, Condon has failed to preserve the error, and it is not reviewable by a federal habeas court. Condon responds by

arguing that the district court analyzed the merits of his claims without imposing a procedural bar and relied, instead, on the Ohio Court of Appeals' analysis.

Condon is correct that the district court did not specifically discuss procedural default in its opinion and relied heavily on the Ohio Court of Appeals' analysis. However, Condon misunderstands the relationship between the Ohio Court of Appeals' standard of review and the procedural default bar. The Ohio Court of Appeals noted that Condon did not object to the prosecutor's comments regarding Waits, so it adopted a plain error review of the issue. *Condon*, 789 N.E.2d at 715-16. By adopting a plain error review, the Ohio Court of Appeals acknowledged Condon's failure to object to the statement and held that the normal standard of review did not apply. We have held that "we view a state appellate court's review for plain error as the enforcement of a procedural default." *Hinkle*, 271 F.3d at 244; *see also Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003) (applying a procedural bar because the state court enforced Ohio's contemporaneous objection rule by adopting a plain error review). While the district court did not specifically rule on the procedural default issue, we have held that the focus of procedural default review is the "last *explained* state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004). By employing plain error review, the Ohio Court of Appeals acknowledged the presence of a procedural bar. Although the district court did not specifically discuss the procedural bar, it used the same rationale as the Ohio Court of Appeals, and thus implicitly enforced Ohio's contemporary objection rule. Nevertheless, the district court's failure to discuss the matter explicitly is not dispositive. *See*

*Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002) (holding that the court of appeals may raise the issue of procedural default sua sponte).

We conclude that Condon's failure to object to the prosecutor's comments regarding Ernie Waits constitutes a procedural default precluding habeas review absent a showing of cause and prejudice. However, Condon did object to the prosecutor's characterization of his art project as "bullshit," so we must consider whether that statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

2.

Condon further alleges that the prosecutor engaged in misconduct when he "improperly testified in closing argument by revealing the identity of individuals seated in the courtroom during trial. During closing the prosecutor repeatedly gestured towards unidentified individuals in the gallery and emphasized their presence by referring to them as 'family.'" Condon also suggests, in a footnote, that the prosecutor improperly referred to a county disciplinary matter concerning the employment status of a county clerk who allegedly made copies of Condon's photographs and disseminated them. The Ohio Court of Appeals did not specifically address this issue. Respondent argues that the family members referenced by the prosecutor testified at trial, so the jury was already aware of their feelings. Respondent argues further that the statement "concerning the clerk is so tangential to any claim in this case that it could hardly be considered prejudicial or misleading."

3.

Finally, Condon argues that the prosecutor engaged in misconduct by making a closing statement "rife with allusions to the ostensible sexual nature, content, and purposes of the photographs in question." The Ohio Court of Appeals acknowledged that the prosecutor made a number of remarks about the sexual nature of the photographs, but it found that such remarks were within the permissible bounds of advocacy, given the facts surrounding the photographs at issue in this case.

> The state's basic argument was that the pictures taken by Condon were taken without permission from the coroner's office, and that they were not taken for official business but, rather, for reasons personal to Condon. The argument that the photographs bore some sexual interest could have arguably gone to the jury's consideration of whether the pictures were to be used for "official business" or personal reasons, as well as to Condon's culpable mental state. For these reasons, such comments were not improper under the facts of this case.

*Condon*, 789 N.E.2d at 715.

Condon also argues that the prosecutor inflamed the emotions of the jury by describing the photographs as "repulsive," "revolting," "horrific," "vial," and "disgusting," and warned the jury to "be careful" when handling the photographs that had been placed into evidence because they might contain "blood or other bodily fluids." *Id*. at 715-16. However, Condon did not object to any of these comments at trial. *Condon*, 789 N.E.2d at 715-16. Thus, as explained above, these comments are procedurally barred from consideration on habeas review absent a showing of cause and prejudice.

B.

In order to prevail on a habeas claim based upon prosecutorial misconduct, petitioner must show that the statements in question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. This is a high burden. When reviewing the statements in question, we must focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The mere presence of prosecutorial misconduct is not enough, "[r]eversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.'" *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). We apply the harmless error test to claims of prosecutorial misconduct. *Mason*, 320 F.3d at 635 (citing *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999)). "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (internal quotations and citations omitted).

We have adopted a two-step analysis for determining whether prosecutorial misconduct meets the *Donnelly* standard of having "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Macias v. Makowski*, 291 F.3d 447, 451-52 (6th Cir. 2002) (quoting *Donnelly*, 416 U.S. at 643). The first step is to determine whether the "prosecutor's conduct and remarks were improper." *Id.* at 452. If the court concludes that they were improper,

it must then apply a four-factor test to determine "whether the impropriety was flagrant," and thus a violation of due process. *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

The first step is uncontested; the prosecutor's comments were improper. The Ohio Court of Appeals noted that "[i]n our view, the prosecutor's comments were highly inappropriate and constituted prosecutorial misconduct." *Condon*, 789 N.E.2d at 715. The district court agreed that these comments were "inappropriate and inexcusable," and the parties do not dispute this conclusion, but they disagree strongly regarding its legal effect. Having concluded that the prosecutor acted improperly, we must apply the four-step analysis from *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994) to determine whether the misconduct was "flagrant." *Macias*, 291 F.3d at 452.

The four factors are: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Carroll*, 26 F.3d at 1385.

Condon argues that the prosecutor's comments "tended to mislead the jury and to prejudice Mr. Condon" because jurors are likely to place great weight on statements made by a prosecutor. He asserts further that Waits was one of only two witnesses called by the defense and that "the prosecutor's remark is magnified by the meaningful role Waits played in the trial." According to Condon, "it is likely that the prosecutor's improprieties had a significant but unobservable impact on the jury, and thereby contributed to Mr. Condon's conviction."

The district court and the Ohio Court of Appeals both ruled that the trial court's curative jury instruction was sufficient to offset any prejudice arising from the statements. We have held that analysis of the first *Carroll* factor "includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury." *Carroll*, 26 F.3d at 1385 (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976) *abrogated on other grounds by United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). The Ohio Court of Appeals explained its conclusion that the comments did not improperly influence the jury:

> Considering all these remarks in the context of the trial, we view them as disturbing, and, in some instances, as improper, but we are not convinced that they were of sufficient magnitude to have prejudicially affected Condon's constitutional right to a fair trial. This was a lengthy case charged with emotion. Without condoning the prosecutor's episodes of misconduct, we believe that the trial court's instructions to the jury when an objection was made cured any impropriety with respect to those remarks.

*Condon*, 789 N.E.2d at 716. We conclude that this factor favors the prosecution. Condon has not met his burden of demonstrating that these comments tended to mislead the jury or prejudice him in light of the curative instruction to the jury.

The second *Carroll* factor asks whether the prosecutorial impropriety was "isolated or extensive." *Carroll*, 26 F.3d at 1385. Condon argues that the conduct meets this factor because "the prosecutor repeatedly denigrated defense counsel, referred to evidence outside the record, and attempted to persuade the jury using sexual innuendo and an appeal to the emotions." However, when the procedurally defaulted comments are removed from consideration, the only remaining offensive comment is the prosecutorial characterization of Condon's art as being "bullshit."

However, this statement is isolated, and thus the second *Carroll* factor does not weigh in Condon's favor.

The third *Carroll* factor asks whether the remarks were "deliberately or accidentally placed before the jury." *Carroll*, 26 F.3d at 1385. Condon argues, without citation to the record, that the prosecutor made a "conscious decision" to "repeatedly and intentionally infuse the trial with these improper remarks in an attempt to convict Mr. Condon in this highly politicized and publicized trial." The record simply does not support this assertion. Only one comment was not procedurally barred. Even if it was made intentionally, an isolated comment, followed by a proper curative instruction to the jury, does not rise to the level of being prejudicial in this case.

The final *Carroll* factor requires us to evaluate "the strength of the evidence against the accused." *Carroll*, 26 F.3d at 1385. Condon argues that "the State did not even present sufficient evidence to warrant a conviction against Mr. Condon, let alone set forth evidence so strong as to overcome the improper and inflammatory comments made by the prosecutor." Again, this argument is rebutted by the record.

The Ohio Court of Appeals ruled that the evidence was sufficient to convict Condon:

The evidence presented at trial was sufficient to establish that Condon took the photographs of Richardson, Folchi, Brady, Melton, Senteney, Frith, Beckman, and Sowards at the morgue and had them developed in print or negative format. Direct evidence was presented that Condon took photographs of Folchi and Brady. Indirect evidence further established that Condon took the photographs of Richardson, Melton, Senteney, Frith, Beckman, and Sowards.

Sufficient testimony was also presented that Condon took the photographs without authorization from the coroner's office. Parrot testified that Condon was never given permission to pursue his "life cycles" project. Both Parrott and Daly testified that

- 15 -

Condon only had permission to come into the morgue on two occasions–once to view the space and once to view an autopsy for the purpose of developing an estimate for the coroner's office on the instructional video. Parrott testified that Condon was given only limited access to the morgue. Condon's access to the morgue was supposed to be used for establishing an estimate of how much it would cost to film an autopsy-training video that was to be used by the coroner's office for educational purposes. With respect to the photographs of Brady, the evidence established that Condon was given permission to view, videotape, and photograph Brady's autopsy on August 16, 2000. Condon did not, however, have permission to photograph Brady for artistic purposes or his personal use, as was suggested by the content of some of the images and the fact that the photographs were later found in Condon's private possession.

*Condon*, 789 N.E.2d at 711-12 (footnotes omitted). Furthermore, Condon did not argue insufficiency of the evidence before the district court and, in general, may not raise this issue for the first time on appeal. *See J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991) ("Issues not presented to the district court but raised for the first time on appeal are not properly before this court.") (citation omitted).

Having concluded that none of the *Carroll* factors weigh in Condon's favor, we hold that Condon has failed to show that the prosecutorial misconduct was "so flagrant as to render the entire trial fundamentally unfair." *Bowling*, 344 F.3d at 512.

III.

Condon argues that the prosecution violated his due process rights by failing to disclose evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995). Specifically, Condon contends that he was entitled to disclosure of an opinion letter drafted by the Hamilton County Prosecutor's office.

*No. 06-4205*
*Condon v. Wolfe*

The Coroner's Office contacted the County Prosecutor for an opinion related to the legal issues involved in filming corpses for an autopsy training video. *Condon*, 789 N.E.2d at 701. The opinion letter explored the lawfulness of using "any aspect of an individual's persona for a commercial purpose during the individual's lifetime or for a period of sixty years after the date of the individual's death." OHIO REV. CODE § 2741.02. Condon was not charged with a violation of this statute; he was charged with abuse of a corpse in violation of OHIO REV. CODE § 2927.01. Condon argues that because § 2927.01(A) states that "[n]o person, except as authorized by law, shall treat a human corpse in a way that the person knows would outrage reasonable family sensibilities," he was entitled to the letter because it could establish that his activities were authorized by law. The Ohio Court of Appeals rejected this argument by noting that the opinion letter addressed a statute not at issue in the present case.

> The letter addressed the propriety of the coroner's office producing an autopsy-training video and whether, as part of this officially authorized project, it would be necessary for the coroner's office first to obtain the consent of the next of kin. The issue of consent under these circumstances, however, did not arise in the context of R.C. 2927.01(B), which proscribes the abuse of a corpse, but under R.C. 2741.02, an entirely different statute that protects an individual's persona against its misappropriation for commercial purposes during the individual's lifetime or for a period of sixty years after death. The prosecutor's office advised that if the training video was reproduced and sold for commercial purposes, then it would be necessary to obtain the consent of the next of kin pursuant to R.C. 2741.02. Conversely, the prosecutor's office also advised that if the training video did not violate the restrictions on commercial use, then the video would be exempt from the provisions of R.C. Chapter 2741.

*Condon*, 789 N.E.2d at 709.  The Ohio Court of Appeals concluded that the district court properly

excluded the letter because it was not exculpatory, did not assist Condon's defense, and was likely

to confuse the jury.

> We conclude that the opinion letter did not constitute material evidence pertaining to Condon's guilt or innocence for abusing corpses under R.C. 2927.01(B).  The letter was concerned with an entirely different matter under an entirely different statute:   commercial appropriation of an individual's persona in an officially authorized autopsy-training video under R.C. 2741.02.  The letter was not favorable to Condon's defense, nor was there a reasonable probability that the result of the proceeding would have been different had the letter been disclosed.  Indeed, it is likely that the letter, if presented to the jury, would have served only one purpose: to confuse the issues, creating the false impression in the jurors' minds that Condon was somehow charged with the intellectual-property crime of appropriating the corpses' personas for commercial purposes rather than abusing them by treating them as models for his photographic art.

> * * *

> The trial court correctly concluded, therefore, that the opinion letter need not have been disclosed under *Brady, supra*, because it was neither material nor exculpatory, and that it was excludable under Evid. R. 403(B) given its lack of relevance and potential for confusion.

*Id*.

Given the possibility of confusion, and the fact that the opinion letter related to an entirely

different statute, we conclude that it was not an error to exclude the letter, and thus not an

unreasonable application of *Brady* or other clearly established Supreme Court precedent.

IV.

Next, Condon argues that his conduct was a form of expression protected by the First and

Fourteenth Amendments.  He recites a litany of cases supporting the proposition that expression is

constitutionally protected even if it is offensive. However, Condon was not charged with taking photos or possessing photographs; he was charged with abusing a corpse. The Ohio Court of Appeals made this distinction when it rejected a First and Fourteenth Amendment challenge on direct appeal, noting that this case is not about the photographs themselves; it is about the means by which they were produced.

> Contrary to Condon's argument, the First Amendment did not grant him a right to abuse a corpse for the purpose of his art. (Employing the same logic, Condon would have a perfect right to dig up bodies from their graves if he decided his next project was "death cycles," a study of the human body decomposing.)

> * * *

> Moreover, even conduct that is sufficiently imbued with communicative elements to fall under the First Amendment is subject to time, place, and manner restrictions. As this court has noted, "The First Amendment has never conferred an absolute right to engage in expressive conduct whenever, wherever or in whatever manner a speaker may choose." *Cincinnati v. Thompson*, 643 N.E.2d 1157 (Ohio Ct. App. 1994).

*Condon*, 789 N.E.2d at 704.

The district court agreed that Condon's activity did not constitute protected expression and supported its conclusion by referring to the test detailed in *United States v. O'Brien*, 391 U.S. 367, 376 (1991), for determining the circumstances in which the government has a strong enough interest in regulating the nonspeech element of a given expression to justify an incidental limitation on First Amendment liberties. *Id*. at 376-77. Ohio's abuse of a corpse statute, unlike the statute forbidding destruction of a Selective Service certificate at issue in *O'Brien*, does not implicate First Amendment concerns.

The Ohio Court of Appeals noted that this was not an example of merely photographing dead bodies, an act protected by the First and Fourteenth Amendments. *Condon*, 789 N.E.2d at 705-06. Here, however, the corpses were not in a place open to public inspection. A morgue is not a lending library or a museum. It is a place of private repose, not of public display. The public expects those in charge to ensure that the bodies of their loved ones are not unnecessarily disturbed or gratuitously handled or examined. Condon did not merely document photographically what the public was free to see, but instead entered the morgue without permission and took pictures of what the public was not allowed to see. Some of the bodies he even manipulated and posed with props for the sake of his artistic enterprise.

And, finally, it should be emphasized that we are not concerned with the act of merely having pictures of corpses in one's possession. An art museum or gallery does not, for example, abuse a corpse by hanging a picture of it for public display, no matter how grisly or offensive the image. This case is about the manner in which Condon took the photographs, and his treatment of the corpses in doing so; it is no way a prosecution based upon the message he sought to express.

*Id*. Condon was convicted of abuse of a corpse, not photographing of a corpse. Condon was not punished for expressive conduct – the photographs merely memorialized the crime; thus we conclude that an *O'Brien* analysis is unnecessary.

Conduct is not expressive unless there is both (1) an "intent to convey a particularized message," and (2) "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). The Supreme Court subsequently minimized the "particularized message" requirement. *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."

(citation omitted)).  Here, the conduct at issue was Condon's private manipulation of and tampering with corpses – activity for which there was no audience to receive any message, even had Condon intended one.  One could imagine that a similar course of conduct in a different context could be characterized as expressive, such that it might trigger *O'Brien* analysis.  However, because the activity at issue here was not expressive conduct, we hold that OHIO REV. CODE § 2927.01 does not implicate the First or Fourteenth Amendments.

V.

Condon argues that § 2927.01 is unconstitutionally vague and overbroad, relying on the plain language of the statute:

> 2927.01.  Offenses against human corpse.
>
> (A) No person, except as authorized by law, shall treat a human corpse in a way that the person knows would outrage reasonable family sensibilities.
>
> (B) No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities.
>
> (C) Whoever violates division (A) of this section is guilty of abuse of a corpse, a misdemeanor of the second degree. Whoever violates division (B) of this section is guilty of gross abuse of a corpse, a felony of the fifth degree.

Petitioner argues that the statutory language "fails to provide adequate notice of what is prohibited because it criminalizes activity merely on the basis of what particular families or the community may find offensive."  Condon argues further that the felony enhancement based on violation of community sensibilities is unconstitutionally vague.  To support his argument, Condon relies upon a district court opinion holding that a state cannot "proscribe speech simply because it

- 21 -

[is] offensive, even gravely so, [to] large numbers of people." *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 863 (E.D. Mich. 1989). However, in the instant case, the district court properly noted that Ohio's abuse of a corpse statute is content-neutral and "does not sufficiently implicate First Amendment concerns to support a facial challenge to the statute on overbreadth grounds." Again, Condon has failed to recognize the difference between constitutionally protected speech and the unprotected act of abusing a corpse.

To comport with the Due Process Clause and survive a void-for-vagueness challenge, a criminal law must both "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement," the most important element of the doctrine is "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Id.* at 357-58 (internal quotation marks omitted).

The stringency of the vagueness test depends upon the context of the challenge. When the statute regulates economic conduct, a less stringent vagueness test applies. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). By contrast, a greater degree of precision is required of criminal statutes "because the consequences of imprecision" are more severe.

*Id.* at 499. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* Consequently, when the First Amendment is implicated, a more stringent vagueness test applies. *Id.* Ordinarily, a vagueness challenge must be made "in light of the facts of the case at hand," and "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Id.* at 495 n.7 (internal quotation marks omitted). In other words, one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495. By contrast, in the First Amendment context a vagueness challenge may prevail on the ground that "it is unclear whether [the statute] regulates a substantial amount of protected speech." *United States v. Williams*, 128 S. Ct. 1830, 1845 (2008).

Because § 2927.01(B) is a criminal statute, a greater degree of precision is required. However, because Condon's conduct was not expressive activity protected by the First Amendment, we do not apply the stringent vagueness test applicable in the First Amendment context. Instead, our inquiry is limited to whether the statute is unconstitutionally vague as applied to Condon on the facts of this case. *See, e.g.*, *Betancourt v. Bloomberg*, 448 F.3d 547, 553 (2d Cir.) (applying a "moderately stringent vagueness test" to determine whether criminal statute was impermissibly vague as applied to defendant because, *inter alia*, defendant's conduct was not expressive activity protected by First Amendment), *cert. denied*, 127 S. Ct. 581 (2006); *Willis v. Town of Marshall*, 426 F.3d 251, 262 (4th Cir. 2005) (holding that heightened review under overbreadth and vagueness doctrines was inapplicable because recreational dancing was not expressive conduct protected by First

Amendment); *Perez v. Hoblock*, 368 F.3d 166, 175 n.5 (2d Cir. 2004) (holding more stringent vagueness test inapplicable because challenged regulation did not implicate plaintiff's First Amendment rights). The Magistrate Judge's Report and Recommendation, which was adopted by the district court, properly identified this standard.

Applying this standard to the facts of the case, we conclude that § 2927.01(B) is not unconstitutionally vague as applied to Condon. Section 2927.01(B) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." Ohio courts, including the Ohio Court of Appeals in this case, have construed this provision to require the State to prove that the defendant acted with at least the mental state of "recklessly." *See State v. Glover*, 479 N.E.2d 901, 903-04 (Ohio Ct. App. 1984). Under Ohio law, "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." OHIO REV. CODE § 2901.22(C).

The constitutional test for vagueness has two parts. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."). We first ask whether the "statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 357. To succeed on a vagueness challenge, "the complainant must prove that the enactment is

vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Flipside*, 456 U.S. at 495 n.7 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

Although the "reasonable community sensibilities" standard contained in Ohio's corpse-abuse statute is not defined with specificity, we believe that it constitutes a comprehensible normative standard sufficient to put a person of ordinary intelligence on notice that the conduct at issue in this case was prohibited. *Cf. Miller v. California*, 413 U.S. 15, 24 (1973) (stating that one of the guidelines a trier of fact must apply in determining whether material is obscene is "whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest" (internal quotation marks omitted)). The record indicates that Condon, among other things, manipulated the body of a nineteen-year-old accident victim, which was at times completely exposed, placed cloth over her eyes, arranged objects on her body, and inserted a key into her mouth, all without legal authorization. We believe it clear that an ordinary person would understand that engaging in such conduct, in the absence of legal authorization, "would outrage reasonable community sensibilities." OHIO REV. CODE § 2927.01(B).[2] As the Ohio Court of Appeals explained in this case: "Community mores concerning the proper treatment of a corpse are not . . . esoteric or otherwise difficult to discern. Irrespective of one's

---

[2]As we have explained, our inquiry is limited to the facts of the instant case, and we express no opinion as to whether OHIO REV. CODE § 2927.01(B) is vague as applied to the hypothetical conduct of others not before the court.

religious views, and even if one is an atheist or an agnostic, it is almost universally understood that the bodies of the dead are to be treated with the utmost respect and in a manner that will not inflict any more emotional pain upon the wounded hearts of friends and mourners."

In *Gaughan v. City of Cleveland*, 212 F. App'x 405, 409-13 (6th Cir. 2007) (unpublished), we upheld an otherwise impermissibly vague noise ordinance against a void-for-vagueness challenge based upon a narrowing construction containing a similar reasonable-person standard. The Cleveland ordinance at issue in *Gaughan* prohibited playing sound devices "in such a manner or at such a volume as to annoy or disturb the quiet, comfort or repose of neighboring inhabitants." *Id.* at 407. Adopting a narrowing construction given by the Ohio Supreme Court to a similar Cincinnati ordinance, we held that a violation of the ordinance required playing a sound device "'in a manner which could be anticipated to offend the *reasonable person*, *i.e.*, the individual of common sensibilities.'" *Id.* at 410 (quoting *State v. Dorso*, 446 N.E.2d 449, 452 (Ohio 1983)). We then concluded that the ordinance was not unconstitutionally vague because this reasonable-person standard was sufficient both to give fair notice of prohibited conduct and to guide law enforcement. *Id.* at 412-13. In the instant case, the "reasonable community sensibilities" language of § 2927.01(B) provides a quite similar reasonable-person standard. Applying the same reasoning, we believe that § 2927.01(B) provides an ordinary person adequate notice of what conduct is prohibited, that is, what treatment of a corpse would outrage the hypothetical reasonable person in the community.

The second test for constitutional vagueness is whether the legislature has established "minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358. We must therefore

consider whether § 2927.01(B) provides sufficient guidance to law enforcement, prosecutors, judges, and juries as to what conduct constitutes recklessly treating a corpse in a manner that would outrage reasonable community sensibilities. We conclude that it does. First, as the magistrate's report adopted by the district court explained, another important constraint is the requirement that the defendant act with the mental state of "recklessness." Under Ohio law, to establish the mental state of "recklessly," the State must show that the defendant "with heedless indifference to the consequences . . . perversely disregard[ed] a known risk that his conduct [was] likely to cause a certain result or [was] likely to be of a certain nature." OHIO REV. CODE § 2901.22(C). As the Ohio Court of Appeals explained, "the state must prove that the defendant knew that his treatment of a corpse was likely to cause outrage to the community, and that he nonetheless 'perversely' disregarded that risk." By requiring the State to establish both an objective element (conduct that outrages reasonable community sensibilities) and a subjective element (defendant must be aware that his acts will likely offend community sensibilities), the recklessness requirement narrows the potential range of punishable conduct and reduces uncertainty as to how this law will be enforced.

Second, the risk of arbitrary and discriminatory enforcement is ameliorated by the statute's reliance on a "reasonable community sensibilities" standard. As explained above, § 2927.01(B) sets forth an objective reasonable-person standard that not only provides fair notice of prohibited conduct but also establishes at least a minimal standard to guide law enforcement so as to minimize arbitrary and discriminatory enforcement. Further, as in the obscenity context where the trier of fact is called upon to apply "contemporary community standards," *see Miller*, 413 U.S. at 24, Ohio's corpse-abuse

law requires the trier of fact to discern and apply "reasonable community sensibilities." Because triers of fact serve as the ultimate arbiters of evolving community sensibilities and therefore of what conduct qualifies as corpse abuse, the discretion of law enforcement is ultimately bounded by normative standards, even if those standards vary from community to community and evolve over time. Although such standard is by nature imprecise, we believe that it provides sufficient guidance to law enforcement to minimize arbitrary and discriminatory enforcement. *See Kolender*, 461 U.S. at 357.

In sum, we conclude that the language of § 2927.01(B) was sufficient to put Condon on notice that his conduct was prohibited and to provide adequate guidance to law enforcement agents. Accordingly, OHIO REV. CODE § 2927.01(B) is not unconstitutionally vague as applied to Condon.

Condon has not distinguished between his arguments supporting vagueness and those supporting overbreadth. He made specific arguments regarding overbreadth below – both the district court and the Ohio Court of Appeals separately addressed the vagueness and overbreadth issues – but has not done so on appeal. By not supporting his allegations regarding the applicability of the overbreadth doctrine to his case on appeal, petitioner has waived this argument. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

## VI.

Petitioner argues that he is entitled to a writ of habeas corpus because the prosecutor sought an indictment against Condon two weeks after the family of the victims sued the county for actions related to this incident. Because the county prosecutor is required by statute to represent the county

in civil litigation, Condon argues that the prosecutor had a motive to seek an indictment in order to avoid civil liability.

Condon argues that "[i]t is impossible to know whether the prosecutor would have even pursued an indictment against Condon in the absence of the conflict created by his knowledge of, and participation in, the civil action." This argument is belied by the timeline of events described in the record. The record reveals that the investigation began on January 8, 2001,[3] when an employee of Robin Imaging Photography Lab noticed the photographs and called the police. *Condon*, 789 N.E.2d at 703. The civil suit was filed on January 26, 2001, and the grand jury indicted Condon on February 12, 2001. Thus, the investigation was underway before the civil suit was filed. Furthermore, on February 22, 2001, the county retained a private law firm to defend its interests in the civil litigation and avoid the appearance of impropriety.

At Condon's request, the trial court held a hearing to explore the possible conflict of interest. The Ohio Court of Appeals noted that Condon's sole argument in support of a finding of a conflict was the timeline.

> At the hearing, Condon presented no additional evidence supporting his motion, but rested solely on the fact that the civil law suit had been filed on January 26, 2001, against Hamilton County employees, and that the suit included Condon and Tobias. After considering the arguments, the trial court overruled Condon's motion but ruled that Condon retained the right to submit further written evidence to support his claim of an actual conflict. At no time prior to trial did Condon offer supplemental proof. In the absence of such supplemental proof in the record, we conclude that the trial

---

[3]The Ohio Court of Appeals stated that the date was January 8, 2001, whereas the affidavit in support of a search warrant listed the date as January 9, 2001. Regardless, the investigation began before the filing of the civil suit.

court correctly ruled that Condon had not established grounds for a vicarious disqualification of the prosecutor's office based upon a conflict of interest.

*Condon*, 789 N.E.2d at 710.

Condon has not presented enough evidence to establish the presence of a conflict of interest. It would indeed be an odd policy, and an invitation to frivolous litigation, for us to rule that a civil lawsuit automatically precluded criminal prosecution by creating a vicarious conflict of interest.

VII.

Finally, petitioner argues that the trial court erred in not giving his preferred jury instructions regarding the definition of the terms "aiding and abetting," "authorized by law," "public office," "public official," and "treat." The Supreme Court has held that erroneous jury instructions in a state criminal trial are generally not reviewable in a habeas corpus proceeding unless the "instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Habeas review of state jury instructions is very narrow because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The Ohio Court of Appeals refused to review whether the "aiding and abetting" instruction was proper because Condon was not convicted of aiding and abetting. *Condon*, 789 N.E.2d at 718. The district court noted that the trial court's "aiding and abetting" instruction referred only to counts for which Condon was acquitted or counts that were dismissed during post-judgment proceedings. Thus, any error in this jury instruction was harmless.

Petitioner asserts that the trial court should have issued its preferred instruction regarding the scope of who is "authorized by law" as that phrase is used in § 2927.01. The trial court issued the following instruction:

> Persons authorized by law include a county coroner and designated members of his staff, physicians and surgeons, accredited medical students, embalmers certified to remove human organs by consent of the deceased according to law, and all other persons acting under authority of law.

Condon argues that this instruction was insufficient because it did not instruct the jury about other forms of authority, such as actual authority, implied authority, or apparent authority. The Ohio Court of Appeals ruled that "the trial court properly instructed the jury" regarding this issue. *Condon*, 789 N.E.2d at 719. Petitioner has not shown how his argument is anything more than a dispute over state law, and federal habeas courts may not overrule a state court's interpretation of state law. *Estelle*, 502 U.S. 67-68. Similarly, Condon argues that the trial court erred by not giving his preferred instruction regarding the definitions of "public officer" and "public official" as they appear in the jury instruction issued regarding the phrase "authorized by law." The Ohio Court of Appeals ruled that these instructions also were a proper application of state law. *Condon*, 789 N.E.2d at 719.

Condon asserts that § 2927.01 did not define the word "treat" in the phrase "no person, except as authorized by law, shall *treat* a human corpse in a way that the person knows would outrage reasonable family sensibilities." OHIO REV. CODE § 2927.01(A) (emphasis added). Petitioner argues that "some physical alteration of the corpse is required," and asserts that the trial court erred in not issuing an instruction consistent with his interpretation. The Ohio Court of

Appeals specifically rejected this interpretation of state law, holding that "physical alteration is not an element of the crime." *Condon*, 789 N.E.2d at 719.

All of Condon's preferred jury instructions were rejected by the Ohio Court of Appeals as not accurately reflecting state law. The state court is the ultimate authority regarding its own law; "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

## VIII.

For the reasons stated herein, we affirm the judgment of the district court.