NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 10a0122n.06

No. 08-5909

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 23, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR |
| | ) THE WESTERN DISTRICT OF |
| | ) KENTUCKY |
| PAUL HOLLERN, | ) |
| | ) |
| Defendant-Appellant. | ) |

**BEFORE:  MARTIN, BOGGS and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Paul Hollern, a doctor of chiropractic medicine, was convicted of one count of intentional interception of oral communications in violation of 18 U.S.C. § 2511(1)(a).  He appeals, claiming that the statute is unconstitutionally vague and that the government failed to present sufficient evidence to support his conviction.  We affirm.

**I**

On February 5, 2007 a grand jury returned a four-count superseding indictment charging Hollern with health care fraud, 18 U.S.C. § 1347; intentional interception of oral communications, 18 U.S.C. § 2511(1)(a); violating the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d-6 (HIPAA);  and retaliation against a witness, 18 U.S.C. § 1513(e).  Following a jury trial, Hollern was convicted of the interception of oral communications count alone; the jury acquitted Hollern of the HIPAA violation and failed to reach a unanimous verdict on either the health care

fraud or retaliation charges, which were subsequently dismissed. The district court sentenced Hollern to one year's probation, with home confinement for the first six months.

Hollern's conviction stems from his use of audiovisual recording devices as part of a training program he ran for chiropractors. Hollern's program taught trainees–recent chiropractic graduates and chiropractors with failing practices–business and patient-management skills. The program included instruction in a four-day process for recruiting patients that Hollern had developed and employed in his own practice. Prospective patients received a complimentary x-ray and consultation on the first day, a chiropractic adjustment on the second day, follow-up on the third day, and a suggested course of treatment on the fourth day. Patients were encouraged to bring a spouse, family member or friend with them on the fourth day, and trainees were instructed to recruit the relatives and friends as patients using the same process.

The goal of the four-day process was to spread out the information given to a patient and to convince the patient to agree to a lengthy course of treatment, preferably paid for in advance.[1] Trainees received instruction on how to communicate with patients, including scripted statements and explanations for certain situations.

In order to evaluate the trainees' progress in following his program, Hollern had them record their sessions with patients.[2] Hollern began training other chiropractors through a series of individual, mentorship-like arrangements. The trainee would work in Hollern's office and practice

---

[1]The health care fraud charge was based on techniques used to convince patients to agree to treatment. Specifically, the government alleged that Hollern taught trainees to misrepresent x-rays and to recommend treatment plans without regard to the patients' needs.

[2]Trainees worked with actual patients, who were apparently unaware that the chiropractors were taking part in a training program.

Hollern's recruitment and treatment methods. To facilitate review, the trainee would bring a tape recorder into the treatment room and record his or her direct interactions with patients. These training arrangements proved both successful and lucrative for Hollerm, who recouped six-figure fees from his trainee's future profits, leading him to expand the program. Eventually, groups of trainees were taught at three clinics, with the assistance of instructors hired by Hollern to teach his program. In 2002, Hollern installed video cameras in patient treating rooms to facilitate trainee recordings.[3] The cameras, which captured sound as well as images, were mounted on the ceiling and transmitted to separate monitoring rooms equipped with screens and VCRs. Trainees were responsible for taping their patient sessions.

Initially, Hollern did not provide patients with any information regarding the cameras. If a patient asked about a camera, trainees were told to say that it was there for security or other purposes. After questions repeatedly arose concerning the cameras, Hollern added a statement on the patient intake form giving consent to the recordings. The statement read:

> I will allow this office to treat me, with other health care providers present, and to record my medical information, including consultation and examination, for documentation purposes, if necessary.

Hollern hired a consultant, who was not an attorney, to review the language, and was told that it was "fine."

---

[3]The cameras were suggested to Hollern by a private investigator, a patient of one of Hollern's trainees. At trial, Hollern testified regarding his conversation with the investigator:

> [H]e approached me and said, "Hey, I can–instead of doing these audiotapes," he said, "I can put videotapes–video cameras in your rooms." And so I said, "Is it legal?" He said, "Yeah." So he put them in and installed them.

The primary purpose of the video recordings remained the same as the audiotapes used by previous trainees: to evaluate trainee-patient interaction. With the addition of video, however, more could be evaluated, such as the trainees' "body language" when treating a patient. In addition, trainees testified that they were instructed to use the cameras to observe patients from the screening room prior to entering the treatment room, and if a patient was accompanied by a friend or family member, the trainee was to listen to their conversations to identify potential barriers to "selling" a course of treatment. Hollern's testimony at trial conflicted with that of the trainees. He testified that they were not supposed to observe patients prior to entering the treatment room, and that doing so would defeat the purpose of evaluating how trainees reacted to recalcitrant patients.

## II

### A

Hollern first challenges his conviction under 18 U.S.C. § 2511 by arguing that the statute is unconstitutionally vague, depriving him of his right to due process. Hollern raises this argument for the first time on appeal. Ordinarily, arguments not raised before the district court are waived. However, we may consider such arguments "to address plain errors or defects affecting substantial rights, especially where, as here, the argument has been fully briefed and involves a purely legal issue." *U.S. v. Wimbley*, 553 F.3d 455, 460 (2009) (citations omitted).

A criminal statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 128 S. Ct. 1830, 1845

4

(2008).[4]  18 U.S.C. § 2511 states, in relevant part:

> (1) Except as otherwise specifically provided in this chapter any person who--
>> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; . . . shall be punished as provided in subsection (4)
>
> \*       \*       \*
>
> (2). . .
>> (d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

Hollern argues that the statute does not provide sufficient notice of what is prohibited.  He concedes

---

[4]The specificity required for a statute to survive a vagueness challenge varies depending on the type of statute at issue.  As this court recently explained in an unpublished decision:

> The stringency of the vagueness test depends upon the context of the challenge. When the statute regulates economic conduct, a less stringent vagueness test applies. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982).  By contrast, a greater degree of precision is required of criminal statutes "because the consequences of imprecision" are more severe. *Id.* at 499, 102 S. Ct. 1186. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.*  Consequently, when the First Amendment is implicated, a more stringent vagueness test applies. *Id.*  Ordinarily, a vagueness challenge must be made "in light of the facts of the case at hand," and "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Id.* at 495 n.7, 102 S. Ct. 1186 (internal quotation marks omitted). In other words, one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495, 102 S. Ct. 1186.  By contrast, in the First Amendment context a vagueness challenge may prevail on the ground that "it is unclear whether [the statute] regulates a substantial amount of protected speech." *United States v. Williams*, [553] U.S. [285], 128 S. Ct. 1830, 1845, 170 L. Ed. 2d 650 (2008).

*Condon v. Wolfe*, 310 F. App'x 807, 820-21 (6th Cir. 2009).

that § 2511(1)(a) unambiguously prohibits the intentional interception of oral communication, but claims that the exception contained in § 2511(2)(d) makes it impossible to know when criminal liability will attach. Hollern argues that because there is no statutory definition of "consent," he could not know whether the consent given by patients to have their "medical information" recorded covered the interceptions at issue.

We have held that "[w]hen the common meaning of a word provides adequate notice of the prohibited conduct, the statute's failure to define the term will not render the statute void for vagueness." *United States v. Namey*, 364 F.3d 843, 844-45 (6th Cir. 2004) (citing *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996)). The first dictionary definition of "consent" is "a: compliance or approval esp. of what is done or proposed by another . . . b: capable, deliberate, and voluntary agreement to or concurrence in some act or purpose implying mental power and free action." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 482 (2002). The common meaning of the term provides ample notice of when otherwise prohibited conduct under § 2511(1)(a) is allowed under (2)(d); if one party to a communication agrees to be recorded, the exception applies absent criminal or tortious conduct. That a particular consent form may or may not be sufficient to prevent an interception from being criminal does not mean that a person of ordinary intelligence cannot understand what constitutes prohibited conduct. *See, e.g., United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008) ("A statute need not spell out every possible factual scenario with celestial precision to avoid being struck down on vagueness grounds.") (internal quotation marks and citations omitted).

We conclude that § 2511 allows a person of ordinary intelligence to understand what is prohibited by the statute.

6

**B**

Hollern next argues that the government presented insufficient evidence to support his conviction. At the close of trial, the district court denied Hollern's motion for a judgment of acquittal based on the sufficiency of the evidence. We review the district court's decision *de novo*. *United States v. Lawson*, 535 F.3d 434, 443 (6th Cir. 2008). Viewing the evidence in the light most favorable to the government, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not independently weigh the evidence or substitute our judgment for that of the jury. *United States v. Davis*, 577 F.3d 660, 671 (6th Cir. 2009). Further, "'[s]ubstantial and competent' circumstantial evidence by itself may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

To establish Hollern's guilt of intercepting oral communications, the government was required to prove beyond a reasonable doubt: 1) that Hollern intentionally intercepted or procured another to intercept an oral communication; 2) made by a person exhibiting an expectation that the communication would not be subject to interception under circumstances justifying such expectation; and 3) that the interception was not otherwise permitted by the statute.[5] *See* 18 U.S.C. §§ 2511(1)(a) & (2); 2510(2). A rational jury could have found each element beyond a reasonable doubt based

---

[5]On appeal, Hollern argues for the first time that the statute should be read to require proof of an intent to violate the statute, rather than simply an intent to commit or procure the interception. This additional element was not included in Hollern's requested jury instruction and its absence was not objected to. The argument is therefore waived. Even had it been properly raised, it is without merit. *See United States v. Hugh*, 533 F.3d 910, 912 (8th Cir. 2008).

on the interception of patients' conversations with family members and friends before trainees entered the treatment rooms.

Hollern argues, as he did at trial, that he never told trainees to observe patients before treatment commenced and that even if he had done so, patients consented to being recorded. He contends that eavesdropping on private conversations would undermine the logic of recording trainee-patient interactions: if trainees knew what to expect, the recording would not provide a genuine opportunity to observe how well they were able to follow Hollern's program. However, trainees testified that they were instructed by Hollern to observe patients before entering the treatment rooms–including listening to their conversations–in order to be better prepared to convince the patients to agree to a course of treatment. The jury was able to weigh the witnesses' credibility and give weight to their testimony accordingly. We may not now substitute our own judgment for that of the jury. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009).

Hollern's contention that patients consented to the interception of their conversations is similarly without merit. The patient intake form gave consent "to record my medical information, including consultation and examination, for documentation purposes, if necessary." Witnesses testified that patients were observed prior to a trainee entering the room, for the purpose of identifying potential obstacles to accepting a course of treatment. Patients' conversations with family members and friends in the absence of a treater are clearly not "medical information," and were not recorded for "documentation purposes." Nor was there evidence that such information was "necessary" to record. Such ostensibly private conversations are beyond the scope of the written consent form.

Hollern has failed to demonstrate that the evidence, construed in the light most favorable to

the government, was insufficient to support his conviction.

### III

For the foregoing reasons, we **AFFIRM**.